## Martin, et al. v. Commonwealth.

(Decided February 24, 1922.)

## Appeal from Bell Circuit Court.

1. Criminal Law—New Trial—Newly Discovered Evidence—Discretion of Court.—Courts are reluctant to grant new trials upon the ground of newly discovered evidence, since it is one easily manufactured and opens a door for fraud and perjury, and ordinarily this ground will not prevail where the newly discovered evidence is only cumulative or impeaching in its nature, though that rule is not imperative, and if diligence is shown and the newly discovered evidence is so material, convincing and controlling as renders it reasonably certain that a different verdict would be returned a new trial will be granted though the evidence is only cumulative or impeaching; and the motion will be sustained upon that ground where the evidence is not altogether cumulative, or impeaching in its nature, if it is of such a decisive and controlling character as that a different verdict would possibly be rendered and refuse the motion, in the light of all the facts and circumstances in the case, would possibly work injustice and prejudicially affect the defendant's rights. The question is one always addressing itself to the sound legal discretion of the court viewing the case in the light of all its facts and circumstances.

2. Criminal Law—Conspiracy—Instructions.—The court in its instructions to the jury, where crime is charged to have been committed as the result of a conspiracy should make it plain that the crime must have been committed within the jurisdiction of the court, since it is that fact which fixes the venue, and not the place where the conspiracy was formed.

J. G. ROLLINS and ISHAM G. LEABOW for appellants.

CHAS. I. DAWSON, Attorney General, for appellee.

Opinion of the Court by Judge Thomas—Reversing.

The grand jury of Bell county returned an indictment against appellants, Paris Martin, John Russell and Jim Herrell, jointly with Vesta Owens, Charlie Martin and Jim Martin, wherein all of the six persons named were accused of wilfully and feloniously conspiring, confederating and banding themselves together for the purpose of murdering Roy Sasser, and that in pursuance thereto they did murder him in Bell county. Charlie Martin and Jim Martin were not arrested or brought before the court, and the other four defendants in the indictment were jointly tried in the Bell circuit court and were convicted, and their punishment fixed at life confinement in the penitentiary. Each defendant filed a separate motion for a new trial, and the one filed by Vesta Owens was sustained and the verdict was set aside as to her, but those filed by the three appellants, Paris Martin, John Russell and Jim Herrell, were each overruled and judgment was pronounced against them in accordance with the verdict, and complaining thereof each of them has appealed, insisting upon numerous grounds for reversal.

In as much as we have concluded that the motion of each appellant should have been sustained on the ground of newly discovered evidence, which will hereafter be noticed, it will not be necessary to discuss or determine many of the points raised, nor will it be necessary to make a detailed statement of the testimony heard upon the trial, and only so much of it will be stated, in a general way, as will serve to illustrate the reasons for this opinion.

The deceased, Roy Sasser, was a young man about 18 or 19 years of age and had been engaged in mining coal in various mines in eastern Kentucky and seems to have been a comparative stranger in the vicinity where he was killed. On June 22, 1921, (Wednesday) at about twelve o'clock his dead body was found about one hundred yards from a water tank on the Southern Railroad near Cumberland Gap in the state of Tennessee, and at a place not far from a public path and not far from a coal chute. It was by no means a propitious place for hiding the evidence of crime. There were a number of shots in his body and blood was found scattered around with a considerable amount under him, and the leaves around the place indicated that there had been some shuffling or scuffling. There was also a bullet hole in a tree near the

body, but there is no testimony from any witness that any shooting was heard at any time at or near that place. The undertaker testified that he had had considerable experience in handling dead human bodies and that it was his opinion that Sasser had not been dead exceeding fifteen hours, though he qualified that statement by saying that he might be mistaken. The place was in the state of Tennessee and about one mile south of the line between that state and Kentucky.

It is the theory of the Commonwealth that defendant, Vesta Owens, a woman who, according to her own testimony, is shockingly lewd and unchaste, lured the deceased to the restaurant of defendant Russell, which is located on the public road leading to the town of Harlan, Kentucky, about one-half or two-thirds the distance up Cumberland mountain, and on a bank about twenty feet above the road; that she brought him there in an automobile between five and six o'clock on Monday evening of June 20, and drove him a short distance up the road and out to a sand quarry, and that her co-defendants then robbed him of his money, and later in the night killed him and carried his body to the place in Tennessee where it was found.

The two principal witnesses lending any support to this theory, are Rosa Barnett and Catherine Douglas, two women who acknowledge their reputations to be as bad or worse than that of the defendant, Vesta Owens. The whole record, we might say, portrays a shocking carnival of debauchery in that neighborhood and which was not improved because of a street carnival that was going on at the time in the town of Cumberland Gap. It should also be noted that the two female witnesses referred to were first arrested charged with the crime, but were afterwards discharged and were not indicted. The grounds upon which they were released do not appear in the record, though there is evidence in the case connecting the witness, Douglas, with the crime, as convincingly, if not more so, than either of the defendants in the indictment. The witness Barnett, who has many aliases to her name, testified that she went to the restaurant of Russell some time before noon on Monday, the 20th of June, for the purpose of buying some minor article and she remained there until late in the afternoon, and during the time the defendants, except Vesta Owens, who was not there, were talking together in a low tone and that they

avoided her and the witness Douglas, who was also there, and tried to get them to leave. That at one time one of the defendants fired a shot near the feet of one of the witnesses. Later there was a conversation in which something was said about money and that defendant, Paris Martin, said he needed some money to pay a pressing debt which he owed; that the witness, Douglas, said that she knew a man who had some money and that she and Vesta Owens had been talking about taking it away from him, but no one says the name of Sasser or any one else was mentioned. Other facts of a remotely incriminating nature were testified to by the witness, who further said that between five and six o'clock that evening Vesta Owens passed up the road in an automobile seated on the back seat with the deceased, Roy Sasser, and a stranger was driving the car, and that they went towards the sand quarry, and a short while thereafter defendants returned to the restaurant when the witness Douglas, asked one of them, "Did you do that," and the answer was in substance, "Yes, b— G—, we did." The witness said that on the following Saturday after the body of the deceased had been found with some marks around his wrist indicating that he had been tied with a rope or wire, she was again at the Russell restaurant where she had a conversation with the defendant, Herrell, in which he acknowledged his guilt, and stated that "they tied a rope around him and put him on poles and carried him down and put him in the car." Witness further stated that in that conversation Herrell said that "They just took his money and didn't aim to kill him, and they kept him tied until along toward midnight," when the defendant, Russell, said, "If you turn him loose alive he will tell it," and that "dead men can't talk," and that they took him back and defendant, Paris Martin, and one of the other indicted Martins killed him. The witness went to Cumberland Gap that night and afterwards stayed in the woods with a man by the name of Hoskins.

The witness Douglas, testified, in substance, that she was at the Russell restaurant on Monday, the 20th of June, and had been there for about two months, and she corroborated the witness Barnett, as to the secret conversations of defendants and their efforts to get her and the witness away from the restaurant, as well as to some of the conversations about money, but she did not testify about Vesta Owens or any one else being with the de-

ceased on the road in an automobile or any other manner, or that the deceased was seen at or about the restaurant on that afternoon. She testified that she left that place with the witness Barnett, and the two went to Cumberland Gap. After arriving there she went to the carnival show and when she came out of it about ten o'clock she met the defendant, Paris Martin, and they started to his house but stopped under a railroad trestle where he stated to her, after taking out his pistol, that he was in great distress and seriously contemplated suicide. He was persuaded by her, according to her testimony, not to do so and the two left that place and went to the home of Martin where they spent the night together, and during the night he made a confession to her, but did not state the name of the person who was killed. She stated that the next morning they passed up the path by the side of which the body of the deceased was found and that she saw what she thought was a human body and called the attention of the defendant, Paris Martin, to it, but he looked in the other direction and made some remark indicating that she was mistaken. The same witness also testified that the defendant, Paris Martin, stated that the automobile in which the dead body was attempted to be carried to the place where it was found broke down and the balance of the trip was made by tying the body and putting it on a horse in front of a rider when it was carried and deposited by the other two indicted Martins at the place where it was found, and that the trip was made in that manner from the sand quarry down the mountain over an old abandoned trail.

The defendants denied most of the testimony given by the two witnesses referred to, including all of the incriminatory part, and testified to an alibi, which is corroborated by a number of other witnesses. They did admit, however, that in the late afternoon of Monday, the 20th, a Mr. Brooks, who lives at Cumberland Gap, drove an automobile by the restaurant and found just beyond it the defendant, Paris Martin, for whom he was looking on a matter of business, and that at the meeting place a pistol which Martin had and which belonged to Brooks, was fired and that those in the automobile, who also testified to that fact, went back to Cumberland Gap with the defendant, Paris Martin, riding on the running board, and this fact is also testified to by the witness, Barnett.

It would be useless to enter into a detail of all the testimony of the defense. It is sufficient to say that the facts and circumstances proven therein, together with the contradictions of the testimony of the two prosecuting witnesses, renders the guilt of the defendants exceedingly doubtful. However, we are not prepared to say that the verdict was so flagrantly against the evidence as to authorize a reversal on that ground, but in view of the doubtfulness of the case we have concluded that it was error to refuse the appellants a new trial on the ground of newly discovered evidence.

Defendants were in jail after their arrest and but one of them was able to employ an attorney, the others being defended by appointed counsel, and they had but little opportunity to prepare their defense before the trial. After the trial they filed the affidavits of Lucille Chadwell, James England, Sam Huston, Clara Bell Huston and Flossie May Jackson, accompanied by their own affidavits showing the necessary diligence. The affidavit of Lucille Chadwell says that the affiant saw the deceased and Catherine Douglas at the carnival show on Monday night dancing in one of the tents, and that she and another saw the deceased on Tuesday afternoon before his body was found at noon the next day. James England stated in his affidavit that he resided with his son-in-law, Sam Huston, just across the Virginia line at Cumberland Gap near the latter place. That on Tuesday before the body was found the deceased and one George Bussell came to the house of Sam Huston in an automobile about four o'clock in the evening and they had a bottle of whiskey; that they left in the car and went towards Middlesboro, but just before leaving Bussell told Huston that he would be back later, and that he would then have the money to pay Huston a debt which Bussell owed him; that Bussell did not return and that while the parties were there the deceased pulled from his pockets a roll of money and took therefrom a ten dollar bill and gave it to the little girl, Flossie Jackson, and sent her to Cumberland Gap to get it changed, which she did, and deceased gave her twenty-five cents for doing so. The affiant says that he was unacquainted with Sasser at that time but saw his body after it was found and recognized him as being the same man who was with Bussell at the home of Huston. The affidavits of Huston, Mrs.

Huston and Flossie May Jackson substantially corroborate that of the affiant England.

This testimony is something more than impeaching and cumulative in its nature, and, if true, is strongly persuasive of the innocence of defendants, and "is of so controlling a character as that it would possibly change the verdict, in which case it is the duty of the court to grant a new trial therefor although it is a ground which the courts reluctantly apply," because of the ease and facility with which it may be manufactured. But, when the materiality of the newly discovered evidence is clearly shown and nothing appearing to indicate collusion, fraud or perjury, and where it is apparent that to deny the new trial would work a manifest injustice to the defendant, it is clearly prejudicial error to refuse it. One of the latest cases approving the above rules of practice is that of Johnson v. Commonwealth, 188 Ky. 391, in which a number of other cases from this court as well as text writers are cited and referred to, and we will not encumber this opinion with excerpts therefrom.

In view of the fact that there must be another trial we deem it proper to notice some formal defects in the instructions. In instruction No. 1 there should be inserted in the fifth line from the bottom following the word "did," the words "in this county," so as to localize the killing of the deceased in the county where the indictment was found, since if the killing was in Tennessee where the body was found, although the conspiracy was formed in Bell county, Kentucky, the venue of the crime would be in Tennessee, the jurisdiction being fixed at the place where the crime was committed and not at the place where the conspiracy to commit it was entered into. There should also be inserted in the third line from the bottom of that instruction just following the word "them" the words "or such one or more of them as entered into said conspiracy," so that the instruction when so modified would direct the jury to find "them, or such one or more of them as entered into said conspiracy, guilty as charged in the indictment," etc. Without the inserted words referred to the jury might be misled into the belief that they were authorized to find all of the defendants guilty, if any one or more of them committed the murder whether they all entered into the conspiracy or not. Likewise, there should be inserted in instruction No. 2 (which is the one with reference to aiding and abetting), just after the

word "them," in the second line from the bottom the words "or such one or more of them as were present and aiding and abetting in said shooting and killing, guilty," etc., so that the language would read, "you ought to find them, or such one or more of them as were present and aiding and abetting in said shooting and killing, guilty" etc. As the instruction was given the jury might be misled into finding any one or more of the defendants guilty if there were others of them present aiding and abetting, although the particular one might not have been present, aiding and abetting. The instructions, as written, are susceptible of a dual construction, but their technical defects might not be sufficiently erroneous to authorize a reversal, though for the purpose of clarity we make the above suggestions.

Wherefore, the judgment as to each of the appellants is reversed with directions to grant them a new trial and for proceedings consistent herewith.