---

## Colson v. Commonwealth.

(Decided October 9, 1923.)

### Appeal from Madison Circuit Court.

1. Homicide—Reaffirmance of Dying Declarations Renders Them Admissible.—A statement made under circumstances which would not render it admissible may become admissible as a dying declaration, where it is afterwards reaffirmed under a sense of impending death, and identified with such clearness as to amount to a practical reiteration.

2. Homicide—Threats Against Accused Admissible on Issue of Self-Defense.—On the issue of self-defense, evidence of threats by deceased against the accused, whether communicated or not, is admissible for the purpose of showing the state of mind of the deceased, and as throwing light on the question as to who was the aggressor.

3. Homicide—Statements Inconsistent With Dying Declaration Admissible.—Where a dying declaration is admitted in evidence, other statements of the declarant, inconsistent therewith and made after the fatal occurrence, are also admissible.

4. Criminal Law—New Trial Sometimes Granted for Newly Discovered Evidence Merely Cumulative.—Even the rule that a new trial will not be granted on account of newly discovered evidence that is merely cumulative, or of an impeaching character, is not a hard and fast one, but is subject to the exception that, if the case is a doubtful one, and the newly discovered evidence is of such a decisive character that it would probably lead to a different result, a new trial will be granted.

5. Homicide—Newly Discovered Evidence Held to Require New Trial.—Newly discovered evidence, consisting of threats made by the deceased against accused, of statements of the deceased contradictory of his dying declaration, and of evidence tending to show that the first shot came from a large caliber pistol which was that used by deceased in the difficulty, held to render it error for the trial court to deny a new trial, though largely cumulative in character.

JAMES M. GILBERT, CHAS. E. HERD and JAMES D. BLACK for appellant.

THOS. B. McGREGOR, Attorney General, and EDWARD L. ALLEN, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE CLAY—Reversing.

George Colson was indicted for murder by the grand jury of Bell county. At the instance of the Commonwealth a change of venue was granted to Madison county, where a jury found him guilty of manslaughter and fixed his punishment at seven years' confinement in the state reformatory. He appeals.

The facts are these: The deceased, Ira Ball, and his wife had lived for a short time on the corner of Cumberland avenue and Fifteenth street in the city of Middlesboro. Cumberland avenue runs east and west, while Fifteenth street runs north and south. Ball and appellant had not spoken for some time. On the evening of February 2, 1922, Ball was in a restaurant playing cards and drinking intoxicating liquor. A short time before the difficulty Ball's wife came to the restaurant for him and took him home in a car. At that time she smelled liquor on his breath. After putting the car away and going into the house for a while, they came out of the house with the intention of going across Cumberland avenue to see Ball's mother. At that time appellant was on his way home

along Cumberland avenue, which was the usual and most practical route. He and Ball were both armed, Ball with two pistols, one of large caliber, and appellant with two smaller pistols. According to Mrs. Ball, the only eye-witness introduced by the Commonwealth, appellant and her husband met in front of her house. Appellant turned and went back from her husband and her husband told appellant to go on home as he did not want any trouble with him. Appellant then told her husband to go on in the house, and called him a vile name. Her husband said, "George Colson, I am at home where you ought to be." Thereupon Colson stepped behind a telephone post, drew two pistols and fired both at once. After that several shots were fired. Her husband, who was shot, fell across Fifteenth street, and was going in the direction of appellant when he fell. She did not know whether appellant was shot or not, but her husband shot at him, and appellant said, "Ira, you have killed me, don't shoot any more." At that time appellant was on the corner of Fifteenth street in front of her house.

With the exception of that part enclosed in parentheses, the following was admitted as Ball's dying statement:

"I know that I am about to die, but am saved and ready to go. On tonight I went to my home and went out again and saw some one out in front and spoke to him. I didn't know who it was. I then saw it was George Colson, who went in his coat for his gun, and I said: 'George, go on, I don't want any trouble with you.' He then shot me and I shot him and he hollooed, and I think I hit him. (I had not done anything except to speak to him in a kind manner up to the time he shot me.)

"I would not have spoken to him if I had known who it was, but it was dark, and I could not see who it was until he got right at me."

Sillar Cavin, who did not see the first of the shooting, says that she saw Ira Ball shoot across Fifteenth street while he was standing by a telephone post. At that time Ball was looking up Cumberland avenue and in the direction one would travel in going towards appellant's home. Mrs. W. H. Breeding, who lived nearby, heard the first three shots. The first two were from a small gun and the third from a large gun. When she first saw Ball he was standing near the mail box. He then stepped off the sidewalk and she turned and left the window. She did not see George Colson there.

Appellant testified that he was on his way home along Cumberland avenue and had to cross Fifteenth street. Ira asked him where in the hell he was going. He replied that he was going home. After passing Ira, Ira made some taunting remark and his wife said, "Don't do that." Thereupon he turned and saw Ira with a pistol in his hand. Ira did not fire until after he had crossed Fifteenth street. Up to that time he had not drawn his pistol. As he turned a second shot was fired. After that, Ira came from tree to tree shooting. One of the shots took effect in appellant's leg. Up to that time he had not fired at Ball. After being shot, he stopped a car and asked the occupants to let him ride, but they refused to do so and drove on. Ball kept coming, and when he fired at Ball, Ball fell. Will Venable heard the shooting, got out of bed to raise his window, saw appellant on the street and heard the shots from the corner of Fifteenth street. At that time appellant was up Cumberland avenue quite a distance from where the shots were fired at the corner of Fifteenth street, and made an effort to get in a car that came by. After appellant had failed to get in the car, he went back to the pavement, but further away from Ball. Ball was shooting up the street in the direction appellant had gone. Ball fell about ninety-five feet above and beyond Fifteenth street, and was walking along shooting when he fell. When Allen Estepp saw the difficulty, Ball had crossed Fifteenth street and was going up Cumberland avenue. At that time Colson was running backwards in the direction of his home. Ball passed up Cumberland avenue for a distance of forty or fifty yards from Fifteenth street, and he and appellant were then shooting at each other. Ball had a big pistol and appellant a small one. Both appellant and Ball were shooting when Ball fell. The first that Marion Estepp saw of the trouble was when Ball was near his residence shooting east towards the other man. He did not know at that time who the other man was. Mrs. E. C. Cline heard the shots. The first two were large sounds, while the third was a small sound. Afterwards she saw some one lying in front of her building, which is almost a hundred feet from the east side of Fifteenth street. At that time she did not know who the party was. Mrs. John Brooks says that the first shots were loud shots and then came the smaller ones. Rufus Thomas saw the men shooting at each other, and at that time they were going east, one running after the

other. The man following the other was running faster than the man pursued. Guy Burk testified that the shots from the big gun were the first ones fired.

In view of certain inconsistent statements contained in the evidence of Mrs. Ball, and of the fact that practically all of the other evidence and attendant circumstances tend to show that Ball not only fired first, but was actually pursuing appellant up the street at the time he was shot, it in insisted that the verdict was flagrantly against the evidence. As the case must be reversed for another reason, and the evidence may not be the same on another trial, we refrain from deciding this question.

After Ball was shot he was carried to the hospital. John Howard, his attorney, was summoned by one of the doctors. On his arrival at the hospital he prepared Ball's will, and at the same time wrote out the dying statement above set out. The doctor stated to Ball that his condition was very serious, and that he did not know whether he (Ball) would recover or not. Before the statement was taken, Ball stated to both of the doctors and his attorney that he was going to die. Shortly after the statement was signed, the doctor recommended an operation for the purpose of saving Ball's life, if possible. Ball agreed to the operation and understood its purpose. As they started to the operating room, Ball said that he felt better and believed he would get well. After the operation Ball got along nicely for six days, and thought he was going to get well. At that time another operation became necessary, and after that Ball did not have any hope of recovery. On the 10th of February, which was two days before Ball's death, his attorney called at the hospital. Ball was then in a critical condition, and stated that he was going to die. Thereupon the following occurred:

" 'Well,' he said, 'Mr. Howard, I am going to die this time, sure.' I repeated this statement to him, as to what he had said—

"By the court: Did you have the paper with you?"

"A. No, sir, but I know exactly what was in it, can tell it to you verbatim, as I did to him. It is a short statement and I know every word of it right now. . . . I asked him if he wanted to change that statement any, or if it stated facts as they happened that night. He said: 'That is correct.' Then he said: 'I do want to make a statement, too, about what happened at Piedmont,' and I got a sheet of paper and wrote two or three lines just as

he said it. Then he said: 'I don't want to make any more statements, I am going to die anyhow,' and I left him in that condition. I think he lived two days after that.''

As Ball, though having declared when the statement was made that he was going to die, agreed a few minutes later to an operation which he understood was to be performed for the purpose of saving his life, and stated on his way to the operating room that he felt better and believed he would get well, it is insisted that the statement was not made under the sense of impending dissolution and after all hope of recovery had been abandoned. Whether so or not, it is unnecessary to decide. It has long been the rule in this state that a statement made under circumstances which would not render it admissible may become admissible as a dying declaration where it is afterwards reaffirmed under a sense of impending death, and identified with such clearness as to amount to a practical reiteration. Jackson v. Commonwealth, 189 Ky. 68, 224 S. W. 649; Smith v. Commonwealth, 113 Ky. 19, 67 S. W. 32; Wilson v. Commonwaelth, 60 S. W. 400, 23 K. L. R. 1251; Young v. Commonwealth, 6 Bush 312; Mockabee v. Commonwealth, 78 Ky. 380; Peoples v. Commonwealth, 87 Ky. 487. In the case of Young v. Commonwealth, *supra,* the deceased made a statement to Esquire Powell the evening he died. At the time he stated that he did not believe the wound would kill him. Thomas McHone, the father of the declarant, testified that he was with his son about an hour after he made the statement to Powell. The son stated that he had made the statement to Powell and that it was true; that he had said to Powell that he did not think he would die, but that he believed he would die and believed so when he made the statement; that he was induced to tell Powell he did not think he would die because a man had been shot in the neighborhood some time before; that the man detailed the circumstances under which he was shot and said he believed he would die; that the man got well and was disgraced; that he did not tell Powell he thought he would die because it would be a reproach to him if he got well. It was held that by the conversation with his father the decedent had reaffirmed the statements which he had previously made to Powell, and that the statements were admissible as a dying declaration. In the case of Mockabee v. Commonwealth, *supra,* a statement was made by the deceased about two hours before he died, and at a time when he expressed the opin-

ion that he would recover. The statement was reduced to writing at the dictation of the deceased, and was then read to and approved by him. Shortly before the death of the deceased, the witness who had reduced the statement to writing returned to his bedside. Thereupon the deceased remarked that he would die in a few minutes. The witness said: ''Jim, I have in my hand the statement you made a while ago of how you were killed. I now want to know whether it is true.'' To this the deceased responded; ''It is.'' The witness then said: ''Shall I sign it for you.'' The deceased nodded his assent and the paper was signed in his presence. It was held that although the statement was made when the declarant believed that he would recover, yet as he afterwards referred to the statement and affirmed its truth when he knew that he was going to die, the statement was admissible, the effect being the same as if it had been originally made under a sense of impending death. In the case at bar the statement previously made was repeated verbatim to Ball, who declared that the statement was correct. It is clear that he then knew that he was going to die and had abandoned all hope of recovery. In our opinion this was such a reaffirmance of the statement as to make it admissible as a dying declaration

The contention that a new trial should have been granted on account of newly discovered evidence presents a more serious question. In his affidavit Roland Nash stated that on the night of the homicide, and a short time before the difficulty occurred, he saw Ball in a restaurant in Middlesboro. Ball had two pistols, one a large one. He was drinking at the time, and in talking about George Colson, said that he would kill him on sight. Afterwards affiant heard the shooting and the first shots were fired from a large caliber pistol. After Ball had been operated on a second time, he went to the hospital and heard Ball say to his brother, ''That he (Ball) fired the first shot and brought it all on himself.'' The affiant, George Ensley, stated that he heard Ball say the evening of the difficulty, and a short time before it occurred, that he would kill Colson if he stayed on the ground. He also heard the first shots fired and they came from a large caliber pistol. The affiant, W. A. Billingsly, stated that he lived near the residence of Ira Ball, and that the first shots fired came from a large gun. Dr. C. K. Broshear stated that while Ball was in his hospital, Ball said that the last

shot fired by George Colson was the one that hit him. Dr. W. G. Brummett stated in his affidavit that Ira Ball, while an inmate of his hospital, said that after a number of shots had been fired, he was led to believe from Colson's statement that Colson was wounded, and he (Ball) stepped from behind a tree or post and at this time Colson fired the shot that brought about his fatal wound. It is not claimed by the Commonwealth that there was any lack of diligence on the part of appellant or his attorneys in not discovering the foregoing evidence before the trial, but insisted that the evidence is merely cumulative or of an impeaching character and therefore not sufficient to authorize a new trial.

It will be observed that the newly discovered evidence consists of threats made by the deceased against appellant, of statements of the deceased contradictory of his dying declaration, and of evidence tending to show that the first shot came from a large caliber pistol. It is the law of this state that on the issue of self-defense, evidence of threats by deceased against the accused, whether communicated or not, is admissible for the purpose of showing the state of mind of the deceased and throwing light on the question as to who was the aggressor. Martin v. Commonwealth, 178 Ky. 540, 199 S. W. 603. It is also the rule that where a dying declaration is admitted in evidence, other statements of the declarant inconsistent therewith, and made after the fatal occurrence, are also admissible. Tolliver v. Commonwealth, 161 Ky. 81, 170 S. W. 515; Allen v. Commonwealth, 134 Ky. 110, 119 S. W. 795; Coyle v. Commonwealth, 122 Ky. 781, 93 S. W. 584. Even the rule that a new trial will not be granted on account of newly discovered evidence that is merely cumulative, or of an impeaching character, is not a hard and fast one, but is subject to the exception that if the case is a doubtful one, and the newly discovered evidence is of such a decisive character that it would probably lead to a different result, a new trial will be granted. Johnson v. Commonwealth, 188 Ky. 391, 222 S. W. 106; Martin v. Commonwealth, 193 Ky. 835, 237 S. W. 1066. In view of the inconsistent statements contained in the testimony of Mrs. Ball, and of the further fact that her testimony received its chief support from the dying declaration of her husband, it is highly probable that the jury would never have convicted appellant if it had been apprised of the fact that shortly before the homicide the deceased had

expressed a purpose to kill appellant, and had also before it the other statements of the deceased to the effect that he, and not the appellant, was the aggressor. Here the newly discovered evidence is not altogether cumulative or impeaching in its character, and being such that it is reasonably calculated to have a preponderating influence on the verdict, we conclude that a new trial should be granted.

Judgment reversed and cause remanded for a new trial consistent with this opinion.