## Stacy, et al. v. Commonwealth.

(Decided October 7, 1927.)

### Appeal from Perry Circuit Court.

1.  Criminal Law.—An "aider and abetter" is one who advised, coun-
    seled, procured, or encouraged another to commit a crime, and he
    need not have been personally present at the time of its commis-
    sion; but one is not an aider and abetter, if he was present at
    the place pursuant to a lawful purpose and in no wise participated
    in the unlawful acts.

2.  Homicide.—Submitting guilt of aiding and abetting in murder to
    jury held error, where evidence showed that defendant was a
    coroner, who went to decedent's residence to execute a warrant
    and in no wise participated in any unlawful acts.

3.  Criminal Law.—While ordinarily a new trial will not be granted on account of newly discovered evidence which is only impeaching, or corroborative, it is ground for a new trial, if it is of such convincing nature that it might have a decisive influence on the jury.

4.  Criminal Law.—Refusing new trial of murder case because of newly discovered evidence, held error, though the newly discovered evidence was merely impeaching or corroborative, where it was of such importance that it would doubtless cause the jury to reach a different conclusion.

W. A. STANFILL for appellants.

FRANK E. DAUGHERTY, Attorney General, and MOORMAN DITTO, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY TURNER, COMMISSIONER—Reversing.

The two appellants were jointly charged with the murder of John Stacy by shooting him. They were then each charged in separate counts with doing the shooting, and the other with being present aiding and abetting. On their joint trial they were each found guilty and sentenced to 10 years' imprisonment, and from that judgment they prosecute this appeal.

Appellant Samuel Stacy was the coroner of Perry county, and late in the day of the 26th of July, 1926, there came to his hands a warrant issued by a magistrate of the county against the decedent, John Stacy, charging him with a misdemeanor, and early in the morning of July 27th he summoned appellant Ezekiel Couch to assist him in the execution of the warrant, and they proceeded to the home of decedent about a mile away. The two went upon the porch in front of decedent's home, Couch going to the door leading into the room and Samuel Stacy going on the porch to the right of the door. Couch called John Stacy and told him to come out, that he wanted to see him. John Stacy then asked him who was with him, and when he answered that Sam Stacy was, according to the evidence of the only witness for the commonwealth (decedent' widow), John Stacy answered, saying, "Boys, go on off," and saying that his wife was in no condition to be frightened. The two appellants then told him to get up and open the door, and John Stacy answered and told them to go on off, and said, "I don't want to go to Pete Stacy's," the latter being the name of the magistrate who issued the warrant. He also

said he was not going to open the door, and then Sam Stacy told appellant Couch to kick the door down, and the door was pushed open, and just as it was opened Couch shot and killed John Stacy, shooting him in the temple about an inch over the left eye. This is the evidence of the widow, who also testified that she and her husband were each in bed; that the head of the bed was across the further corner of the room on the right of the door as you enter; that the door opened to the right; and that the only shot was fired by Couch when the door was sufficiently open for him to see decedent. She also states that, while the head of the bed was toward that corner, as a matter of fact she and her husband were sleeping with their heads at the foot of the bed, so that their heads were pointed to the door that Couch opened and their feet toward the corner of the room. She states that her husband was lying in bed when the shot was fired, or had possibly raised upon one elbow, but there is no satisfactory explanation by her as to how her husband was shot in the left temple an inch over the left eye when he was lying in the bed, or raised on his elbow, with the back of his head toward the door from whence the shot came.

On the other hand, Couch's testimony is that he called John Stacy three or four times, and he finally answered and asked what he wanted, and when told that he wanted to see him he asked who was with him, and when he told him Sam Stacy, John Stacy then commenced cursing, and said:

"I ain't going down before that God damn son of a bitch Pete Stacy. I've been down there once."

Sam Stacy then told him you have not been down there on this warrant, and then John inquired what this warrant was for, and, upon being informed, said:

"By God, I ain't going to give up; you fellows go away and let me alone; I ain't going before Pete Stacy."

Sam Stacy then informed him that, if he would do right, they would take him anywhere he wanted to go, and John Stacy answered:

"You heard what I said. I ain't going; you fellows go off and leave me alone; there will be somebody to carry off."

Then Sam Stacy directed Couch to shove the door open, which he did, and the shooting immediately followed. Couch further testifies that, when the door was wide enough open for him to see John Stacy, he was either on his knees on the bed or sitting on the side of the bed and was getting his shotgun in position to shoot, raising up his shotgun, and that he then fired hastily one shot as he got behind the door facing; that Sam Stacy then said to him, "Don't shoot," whereupon he relied, "I had to or let him shoot me."

Appellant Sam Stacy was to the right of Couch on the porch and not in position to see decedent, John Stacy, when the door was opened; but in all other essential respects his testimony was in substance the same as that of Couch.

They each also stated that, when decedent's wife left the room a minute or so after the shooting, they immediately went in and found the body of John Stacy, on the floor beside the bed with his shotgun lying across his body. They each further testify that nothing was moved or disturbed in or about the room, and that they left in a short time; and other witnesses who got to the house a half hour later said that the body of John Stacy was lying alongside of the bed, between it and the wall, with the shotgun across his body, although there is some difference as to the exact manner in which the shotgun was lying.

The decedent's widow and the two defendants were the only eyewitnesses, but on the trial below there was considerable evidence as to the physical facts, which for the purposes of this opinion it will not be necessary to go into with any particularity.

There was a plat or map used upon the trial below, which is not before us, but which showed certain measurements with reference to the height of a bullet hole or indentation which was evidently made by the bullet which killed decedent. Without the assistance of that plat it is somewhat difficult to understand exactly to what extent it corroborates the version of one side or the other; but from the measurements made and the height of the indentation on the wall it apparently tends strongly to corroborate the story of the two defendants. The height of that indentation indicates that decedent was not lying in the bed when he was shot, or even raised upon his elbow, to say nothing of the fact that the whole evidence shows that, had he been lying in the bed with his head

toward the door, in such position it would have been a physical impossibility for the bullet to have entered his temple above the left eye.

It is obvious that appellant Sam Stacy was convicted as an aider and abettor of Couch, and the first inquiry is whether there is any evidence of aiding and abetting upon his part, for, if there was not, the court erred as to him in overruling his motion for a directed verdict. There was only one shot fired, and that by Couch; appellant Stacy at the time being in such position that he could not see decedent or understand why the shot was fired. He was at the place in the discharge of an official duty, and there is a total lack of evidence that he advised, counseled, procured, encouraged, or directed Couch to fire the shot; on the contrary, immediately after the firing he directed Couch not to shoot, and in addition it shows that just before the door was opened, and after decedent knew that they had a warrant for him, he offered to take him before some other judicial tribunal than Squire Stacy, if he would behave himself and submit to arrest. All of his conduct there showed that he was only conscientiously attempting to serve a warrant, which it was his official duty to do, and there is no intimation in any part of the evidence that he, prior to the shooting in any way advised, directed or counseled Couch in the firing of that shot. The only thing he did was to direct him to open that door, and that he had a right to do in pursuance of his lawful purpose to serve the warrant.

An aider and abettor is one who advises, counsels, procures, or encourages another to commit a crime, even though he may not be personally present at the time of its commission; but the mere fact that he is present and went to the place with the other pursuant to a lawful purpose, and in no wise participated in the unlawful acts, if any, of the others, does not constitute him an aider and abettor. Landrum v. Commonwealth, 123 Ky. 472, 96 S. W. 587; Wheeler v. Commonwealth, 120 Ky. 697, 87 S. W. 1106.

To hold an officer of the law guilty of aiding and abetting in the commission of a crime because he directed one who had been summoned to assist him in the execution of a warrant to do a lawful thing necessary to its execution would be to discourage conscientious citizens from accepting such public positions.

We are of opinion that the evidence did not authorize the submission of this case as to the appellant Samuel

Stacy, and that the court erred in not sustaining his motion for a directed verdict of not guilty.

As to appellant Couch, it is said that the verdict is flagrantly against the evidence; that the direct testimony, fortified by the physical facts, entitles him to a reversal. The court, however, expressly declines to pass upon this question, as the judgment as to Couch must be reversed for another reason.

The defendants also sought a new trial upon the ground of newly discovered evidence, and, in support of that ground, filed their own and the affidavits of four others. Each of those affidavits disclosed that none of the four affiants had disclosed such evidence to either of defendants, or any of their counsel, until after the verdict had been returned, and there is nothing to show that the same could have been earlier ascertained by defendants or their counsel by the exercise of any diligence.

One of those affiants states that the day before the homicide decedent had told him that he understood there was a warrant out against him issued by the magistrate, Stacy, and that it was to be given to Sam Stacy to serve on him, and that decedent said:

"Sam Stacy had better not come on me with that God damn warrant, for me or him one will be to pack off, for I will damn sure not go before old Pete Stacy any more."

The same affiant stated that on the day of the homicide he talked with the widow of John Stacy, and that she told him when he inquired how it happened that it was a good thing Couch shot John Stacy when he did, or John would have killed him, for John had just got his gun to kill him.

Another of those affiants states that about an hour after the homicide, while affiant was at the home of John Stacy, his widow stated to him, in explaining how the shooting occurred, that Sam Stacy and Zeke Couch came to their house and called to John Stacy and told him they had a warrant for him, and that John told them he would not submit to arrest, and told them to go away, or they would be to carry away; that Sam Stacy then told Zeke Couch to push open the door, and when he pushed the door open decedent got his gun up and had it pointed towards the door, or was getting it pointed that way, when Zeke Couch shot him.

Another of those affiants states that on the day of the homicide the widow told him that when Sam Stacy and Zeke Couch came to their home to arrest John Stacy, John Stacy told them that, if they did not go away from there and leave him alone, they would be to carry away.

Another of those affiants states that the day after the homicide the widow told her that John Stacy raised up in bed as the door came open, and had a shotgun in his hand, but that Zeke Couch was too quick for him and shot before he could.

The only material difference between the evidence of the widow and the two defendants is whether decedent had his shotgun in his hands at the time Couch fired, and what decedent's position in or on the bed was, and whether decedent had threatened the two officers before the door was opened. These things were the vital things in the whole case; for obviously if Couch pushed open the door while he was lying in the bed, or resting upon his elbow, and shot him at a time when he had no weapon in his hands, the verdict of guilty was authorized. If, on the other hand, at the time the door was opened decedent was either on his knees on the bed or sitting on the side of the bed with his shotgun in his hands pointed toward the door prepared to execute the threat defendants say he had theretofore just made, then Couch was jusified in shooting to protect himself.

It is clear that the jury could not have returned this verdict unless they had accepted the widow's version of what had occurred, and how it had occurred, and it must therefore be apparent how vital this newly discovered evidence was to the defense. It not only fully corroborates the statements of the two defendants, but as we understand the physical facts in evidence it is likewise in full accord with them.

But it is said for the commonwealth that the newly discovered evidence is only cumulative and impeaching in its nature, and that a new trial will not be granted upon the discovery of such new evidence. While the general rule is that ordinarily a new trial will not be granted on account of newly discovered evidence which is only impeaching in its nature, or which only tends to corroborate evidence given on the trial, this is not a universal rule; but, where such newly discovered evidence is of such a convincing nature that it might have a decisive influence upon the jury, the trial court should grant a new trial. Breeding v. Commonwealth, 191 Ky.

128, 229 S. W. 372; Spencer v. Commonwealth, 192 Ky. 232, 232 S. W. 381; Colson v. Commonwealth, 200 Ky. 402, 255 S. W. 60; Martin v. Commonwealth, 193 Ky. 835, 237 S. W. 1066; James v. Commonwealth, 197 Ky. 577, 247 S. W. 945; Johnson v. Commonwealth, 188 Ky. 391, 222 S. W. 106.

The verdict of guilty against Couch in this case rests wholly upon the testimony of one commonwealth witness upon two vital questions, and her evidence upon those two questions is not only contradicted by the only other two eyewitnesses, but appears to be out of harmony with the physical facts. Obviously, therefore, it was very important to defendants that the evidence set forth in the affidavits contradicting and impeaching her testimony on these points should be considered by the jury, and furnishes such new evidence, even though it only be impeaching, as would doubtless cause the jury to reach a different result. We are impelled therefore to the conclusion that the court erred in not granting each of the appellants a new trial.

The judgment is therefore reversed as to each of appellants, with directions to grant each of them a new trial, and for further proceedings consistent herewith.