## Martin, et al. v. Commonwealth.

(Decided March 23, 1928.)

### Appeal from Campbell Circuit Court.

1. Homicide.—In prosecution for murder, alleged to have been committed in tavern brawl by stabbing victim subsequently taken away and laid across car tracks and dismembered by passing

street car, evidence held sufficient to sustain conviction for voluntary manslaughter.

2. Homicide.—In prosecution for murder, instructions under Ky. Stats., secs. 1166, 1242, authorizing jury to convict defendants for maliciously striking deceased with a deadly weapon with intent to kill him or of striking him in sudden heat and passion without malice, held not prejudicial to defendants, convicted of manslaughter.

3. Criminal Law.—Cases dependent upon circumstantial evidence are submitted to jury in same manner as where evidence is direct, leaving jury exclusively to weigh facts and circumstances, and refusal to instruct as to weight to be given circumstantial evidence was not error.

4. Criminal Law.—Alleged error of court in interrogating witness as to whether he had conversed with any one after he had been placed under rule and of commonwealth's attorney in cross-examining witness as to number of times she had been married, if improper, held not of such prejudicial nature as to warrant a reversal.

WM. F. CLARK, THOS. W. HARDESTY and THOS. D. SLATTERY for appellants.

F. E. DAUGHERTY, Attorney General, and G. D. LITSEY, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

The appellants Jake Martin, Ben Martin, Stanley Nicholson, and one Clarence Layton were jointly indicted in the Campbell circuit court charged with the offense of murdering Owen Campbell, and upon their joint trial the first three were convicted of voluntary manslaughter and punished by confinement in the penitentiary for a period of 15 years each, but Layton was acquitted. The convicted defendants have appealed to this court and through their counsel urge as grounds for reversal: (1) that the verdict is flagrantly against the evidence; (2) erroneous instructions and failure to instruct on the whole law of the case; and (3) prejudicial conduct on the part of the court and commonwealth's attorney during the progress of the trial. Some of the grounds are subdivided in the argument as made in the briefs, many of which are wholly immaterial and altogether without merit, and during the course of this opinion we will refer to and discuss only such of them as we conclude the facts of the case justify.

1. In disposing of ground (1) it becomes necessary to make a brief statement of the substance of the facts as

given by the testimony of the witnesses introduced by the commonwealth. On the 29th day of May, 1926, and for about one week prior thereto, appellant Nicholson was the lessee of a one-story concrete building consisting of three rooms located at No. 317 Isabella street, in Newport, Ky. It was used by him as a rendezvous for all sorts of law violators, both male and female, and in which many disreputable and prohibited acts and conduct were performed and engaged in. It was, in every sense of the term, a most disorderly house wherein intoxicating liquor was manufactured, sold, and consumed by those who resorted there, including lewd women from Cincinnati and surrounding territory. Gambling was also indulged in, and, according to the testimony of the commonwealth's witnesses (all of which on that subject was virtually admitted by defendants), the establishment was a menace to peace and good order in that community. The other two appellants, Jake Martin and Ben Martin, were brothers and seemed to have been secret partners of Nicholson, or in some manner connected with the prosecution of the unlawful operations of the establishment. On the late afternoon of the day mentioned the deceased went to the house at 317 Isabella street and remained there for some time, when he left and later returned in company with one Tony Buckholz, a Hungarian, who spoke the English language with difficulty. They immediately commenced, with others present, to consume a quantity of home-brew that was manufactured in the house, and later engaged with others in a game of draw poker in which defendants appear to have participated, and during which time at least three demimondes from Cincinnati were present and also participated in the drinking, a part of which was the consumption of moonshine liquor mixed with the home-brew. Somewhere between 8 and 9 o'clock (the testimony being indefinite), the Martins and Nicholson became involved in a physical imbroglio with deceased and also with Buckholz, in which the latter was beaten over the head with beer bottles and with chairs, resulting in injuries that confined him to his bed for three weeks thereafter. He escaped by running out of the door of the building, but, according to his testimony, he was knocked down after he left the steps going into the building, and he testified that while he was being so punished similar or worse chastisement

was being administered to deceased by defendants, and he was calling for help, and as the witness left the premises he saw deceased lying on the floor moaning and groaning with a bloody head and face and almost lifeless.

Pat Atwell, a boy residing in the neighborhood and who was about 12 years of age, was working at the place in the capacity of waiter and in the performance of other errands required in the entertainment of the patrons, corroborated the testimony of Buckholz in almost every particular, but he tarried a few minutes longer and emphasized in his testimony the serious, bloody, and apparently lifeless condition of deceased when he left. Two incidents appear to have been the immediate cause of the trouble, one of which was that some one had hidden the straw hat of deceased which culminated in a controversy followed by the fight, and the other was that Buckholz was not given the change for a $10 bill with which he was paying either for poker chips or beer, and they appear to have occurred almost simultaneously, resulting in the double-barreled fight between the deceased and Buckholz on one side and defendants on the other. Two of the females who were present stated that at the time they were in an adjoining room and heard angry words and saw one of the defendants with a raised chair, followed almost instantly with a noise as if made by striking the floor with the chair, immediately after which the witnesses disappeared. About 30 minutes after Atwell left he returned to the house with a companion about his age, and it was closed and all the lights extinguished, with no appearances of any one being therein, and which was near 10 o'clock p. m.

At about 10:50 p. m. a street car was rounding a horseshoe curve in the track laid in Eden Park, in Cincinnati, Ohio, and as it arrived at the sharp point of the curve and at a place where there were no lights the motorman discovered about 15 feet ahead of his car the body of deceased lying on his back between the rails, with blood on and over his face, and it had the appearance of being dry and much darker than fresh blood. The car could not be stopped before reaching the body, and it was run over and moved along the track for a distance of from 8 to 20 feet according to the testimony of the witnesses. While under the car the right arm of deceased was completely severed and some scattering bruises

made upon his body. There were also sharp cuts on his
forehead and face and one small thrust of a sharp instru-
ment into his heart. It required an hour or more to jack
up the car so as to extricate the body of deceased from
under it. Some of the witnesses testified that his flesh
was cold and perhaps one testified that rigormortis was
present, and the great majority of them testified that the
blood on decedent's face was coagulated and dark, as was
also true with a large clot of blood extending from his
nose. It was also shown, practically without contradic-
tion, that there was no blood of any consequence at the
place where the body lay at the time it was first discov-
ered by the motorman, but there was some blood immedi-
ately under or near to the right side of decedent upon
which he rested when the car was stopped, and every wit-
ness testified that life was extinct. An autopsy held
within from four to six hours afterwards established the
fact that the stab in the heart with the sharp instrument
was sufficient to produce death, and also developed a
large quantity of coagulated blood in the lungs and in the
cavity of the heart gathered there by internal hemor-
rhage, the wound being of such a nature as to prevent
external flowing. From the facts discovered by the phy-
sician performing the autopsy, together with a history
of the case obtained from the witnesses who were present
at the removal of decedent's body from under the car,
he was enabled to and he did state as his fixed opinion
that deceased was dead at the time the car ran over his
body.

Another proved fact was that there was no flowing
blood from the part of the arm that had been severed and
but little, if any, from the stump attached to the body.
The pool of blood under or near to the body when the
car stopped was fully accounted for by showing that
pressure on the body by some parts of the car caused the
flow of the gathered blood in the lungs and heart cavity,
which also explains the bloody shirt sleeve of the
severed arm, which was lying in or was dragged through
the pool of blood pressed from the body. Another strong
circumstance corroborating the opinion of the physician
was the fact that there was no blood between the point
where the body was discovered on the track and where
it was taken from under the car, although the arm was
severed between those points. It was indisputably

proved by all of the physicians who testified in the case that unless life was extinct the arteries in the severed arm would have profusely bled and marked the trail on the track from the point where the severing took place. Instead, however, there was not only no blood found, as stated, but, on the contrary, the skin on each end of the severed arm was apparently lifeless and without vitality. Great stress is laid upon certain answers of the physician witness introduced by defendants, but upon cross-examination and when confronted with the facts which we have referred to, but given in more detail by the witnesses, he was compelled to admit that if they were true then the physician witness for the commonwealth, who was the coroner of Hamilton county, Ohio, told the truth when he gave it as his fixed opinion that the body was lifeless when discovered upon the street car track.

We deem it unnecessary to enter into greater detail of the commonwealth's testimony, except it may be added that some of the garments of defendant Nicholson were afterwards found to have blood spots on them and a hat was found near the scene of the street car accident that was shown not to be the one worn by decedent, but one owned by defendant Nicholson. The officers who finally arrested defendants did not visit the house at 317 Isabella street, in Newport, Ky., until late Monday afternoon following the Saturday night when the fight occurred there, as hereinbefore related. They discovered on some of the clothing of defendant Nicholson (and other witnesses testified to the same), spots of human blood, and a shirt was found by the officers which was freshly washed. Defendants attempted to account for the bloody clothing by saying that Nicholson engaged in a fight with a stranger, who was not introduced, on the intervening Sunday night, on the pavement near the front of his establishment. Layton, who was acquitted, as we have stated, was operating a car that night belonging to his father. However, he testified that he was not present at the time of the fight above referred to, but for a considerable portion of the time his car was parked in front of a house not far away.

Defendants deny that there was any disturbance at 317 Isabella street on the night in question, and they testified that deceased never came to that house the second time on that day, but that when he left near 6 o'clock p. m. he started towards the Ohio river as if to go to his home

in Cincinnati, Ohio. They also prove by a distant cousin of deceased who lived in Cincinnati that the latter came to his house about 6 o'clock p. m., or possibly earlier on the fatal day, and stayed there until as late as 9 o'clock, and that during the time the two consumed a considerable quantity of liquor, and that deceased was very much intoxicated when he left, ostensibly for his home, but the testimony of that witness is considerably shaken on cross-examination, and the same is true with many of the other witnesses, including the defendants. One of the female witnesses who testified for them, Virginia Autry, testified that between the fatal Saturday night and the following Monday night the defendant Ben Martin came to her home in Cincinnati and said to her:

> "Don't you come over to Newport; if you do, you will get in trouble."

And that at the same time he also said to her:

> "I can lick any s—— of b—— police officer in Newport."

He denied making those statements, but they were testified to by his witness for whose credibility he vouched when he put her on the stand, and they are not of such improbable nature as to seriously weaken their credibility.

The case, like all others involving circumstantial evidence, could have been made stronger, especially in the one link of transporting the body from Newport to Eden Park, in Cincinnati. However, the same may nearly always be said with reference to circumstantial evidence. If witnesses had been introduced to prove that defendants actually transported the body to the place where it was found on the railroad track, then it would cease to be circumstantial in its nature, and properly classified as direct testimony. The fact that there was a fight at the house in Newport, and that as a result of it deceased was rendered unconscious and in an apparently dying condition, is quite clearly established by the positive testimony of the commonwealth's witnesses, neither of whom is the least interested in the outcome of the prosecution, and the same may be said with reference to the extinction of life in the body of deceased when discovered on the track by the motorman of the street car.

Some one that night inflicted the mortal wounds upon the body of deceased, and the one who did it and

who was most interested in concealing the crime, will be presumed to have placed the body upon the street car track. There was no evidence by any one that deceased engaged in any other difficulty on that fatal evening, and the same human experience that informs us that the perpetrator of the crime would most likely be the one who placed the body at the point where the motorman discovered it so as to destroy the evidence of his deed also informs us that he would hide the tracks made by him in removing the body to that point.

But it is said that none of the clothing that deceased had on when taken from under the car was rent by any knife or other instrument, and which is true. We have already referred to some of the testimony indicating a probability of change of clothing before the body was removed, as well as efforts to destroy the evidence of the crime which was discovered by the policeman in the house in Newport on Monday night after the fight on the preceding Saturday night. It is not shown whether deceased at the time of the fight was in his shirt sleeves or had on his vest or coat, nor was it shown that, if he wore either or both of them, they were buttoned. It was shown, however, that the weather was warm, and some of the parties, at least, were in their shirt sleeves. If both the coat and vest were unbuttoned, the stab could easily have been inflicted without penetrating either, and the shirt could easily have been changed before the removal of the body, as was evidently true as to the hat of deceased. While the absence of rents in the clothing of deceased is a circumstance in their favor, yet it is by no means conclusive proof of their innocence. The stabbing wound is in some manner attempted to be accounted for as having been inflicted by a broken rib made while decedent's body was under the street car, but such insistence is so far fetched and so wholly contradicted by the proved facts as to render it of no consequence. Besides, the coroner who performed the autopsy positively contradicted any such theory and stated that the wound was inflicted by some sharp instrument.

It is further insisted that no one saw any knife during the fight. It is true that no one testified to having seen a knife, but they did testify to a general fight with the resultant injuries inflicted on both deceased and his companion, Buckholz, and the nature of the wound showed that if inflicted by a knife it was evidently a small one, and in the excitement, plus the fear of a raid by the offi-

cers and an arrest of the witnesses, it is not unnatural that the witnesses failed to observe everything that was done on that occasion or every instrument that may have been employed in the doing. A small pocket knife in one's hand can be easily concealed and is often unobserved.

This case in its essential features is no weaker in its circumstances of guilt than that of Martin v. Commonwealth, 193 Ky. 835, 237 S. W. 1066. In fact, the circumstances herein pointing to the guilt of defendants are stronger than were those appearing in that case, and in denying this same ground, urged and insisted on herein, we said:

> "However, we are not prepared to say that the verdict was so flagrantly against the evidence as to authorize a reversal on that ground."

In many other cases, even weaker in their facts, we declined to hold that the verdict was flagrantly against the evidence, and we are of the same opinion in this case, and this ground must be and it is denied.

2. A part of the argument in support of ground (2) is directed to instructions authorizing the jury to convict defendants of maliciously striking deceased with a deadly weapon with intent to kill him or of striking him in sudden heat and passion and without malice, as defined by sections 1166 and 1242 of our Statutes, and it is claimed that the court in giving them departed from the language of the indictments. Whatever may have been the duty of the court with reference to giving such instructions, most assuredly they had no prejudicial effect on the rights of defendants in this case. If the court erred in doing so, it was more favorable to them than they were entitled to. However, defendants were not convicted under either of them, but of a higher offense, and the form of them did not contribute to that result, since there is no complaint, nor could there be of the wording of the instructions if it were proper to give them.

Another argument under this ground is that the court, in the language of counsel, should "have instructed on circumstantial evidence." We gather therefrom that counsel conceives the law to be that it is the duty of the court to comment on the weight to be given by the jury to circumstantial facts. But we have uniformly held, contrary to the rule in some other jurisdictions, that it was error for the court to single out any

item of evidence and express an opinion upon its weight and credibility. See Brady v. Commonwealth, 11 Bush, 283; Smith v. Commonwealth, 140 Ky. 599, 131 S. W. 499; Stephens v. Commonwealth, 196 Ky. 86, 244 S. W. 301; and Hart v. Commonwealth, 198 Ky. 844, 250 S. W. 108. On the contrary, it has been the uniform rule in this jurisdiction to submit a case dependent upon circumstantial evidence to the jury in the same manner as where the evidence is direct, leaving the issues to be determined by the jury from all of the facts and circumstances which its members are to weigh exclusively. The domestic cases cited in support of this contention of Brown v. Commonwealth, 117 Ky. 766, 78 S. W. 1126, 25 Ky. Law Rep. 1896, Stanley & Nix v. Commonwealth, 184 Ky. 237, 211 S. W. 577, and Duroff v. Commonwealth, 192 Ky. 31, 232 S. W. 47, do not touch the point at any angle, but are cases in line with many others to the effect that it is the duty of the court in criminal prosecutions to give the whole law of the case and without request of defendant.

3. Under ground (3) it is argued that the court committed grave error when during the trial it interrogated a witness as to whether he had conversed with any one after being placed under the rule, and also that the commonwealth's attorney erred in cross-examining the witness Autry as to the number of times she had been married. Even if it should be conceded that such conduct on the part of both officers was a departure from rigorously strict rules for the proper conduct of criminal trials, it could scarcely be said that it was of such a prejudicial nature as to authorize a reversal of the judgment. In saying so we do not mean to intimate that the complained of conduct of either officer was either erroneous or improper, but if otherwise, each of them was unsubstantial and furnishes no grounds for reversal.

Upon the whole case we find no substantial grounds for disturbing the judgment, and it is accordingly affirmed.