## Johnson v. Commonwealth.

(Decided June 4, 1920.)

### Appeal from Bourbon Circuit Court.

1. Criminal Law—Motion for New Trial—Newly Discovered Evidence.—While a new trial will not be granted on the ground of newly discovered evidence which is merely cumulative in character, or corroborative of what was testified to by defendant, yet if the newly discovered evidence is of a decisive and controlling character the rule is changed, and in such case the newly discovered evidence, if there is no want of diligence on the part of the party applying for the new trial in discovering it, will authorize the granting of a new trial. Applications for a new trial are addressed to the sound discretion of the court, to be exercised according to the rules and usages of law, and the court should regard the substantial justice of the case, equally remote from favoring negligence or exacting unreasonable diligence. This rule is especially true in capital cases and where there are other errors and irregularities appearing upon the trial and which themselves were calculated to have a bearing upon the verdict.

2. Criminal Law—Argument and Conduct of Counsel—New Trial.—An attorney in the argument of a case to the jury should not go outside of the record for the purpose of abusing and vilifying a witness or client, nor should he state as a fact that which was not proven in the case, either by direct or circumstantial testimony, and if he should accuse the person referred to of an independent offense which was unsupported by any testimony, direct or circumstantial, it would at least be the duty of the court to

sustain an objection to it and to admonish the jury accordingly, and his failure to do so would constitute substantial error authorizing the granting of a new trial.

3.   Criminal    Law—"Bootlegger"—Meaning    of    Term.—The    term
     "bootlegger" is commonly understood as describing one who engages in the unlawful sale of spirituous liquors, and an attorney in his argument to the jury transgresses his duties in applying the term to a client or a witness when there is no evidence to authorize it.

EDWIN P. MORROW and O. T. HINTON for appellant.

CHARLES I. DAWSON, Attorney General, and T. B. McGREGOR, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

The grand jury of Bourbon county returned an indictment against the appellant, Oscar N. Johnson, charging him with murdering Walter Rice, which occurred at about 7 p. m. on January 29, 1918, in the restaurant of A'Hern & Burton, located at the corner of Tenth and Pleasant streets in the city of Paris, Kentucky. Appellant entered a plea of not guilty, but upon his trial the jury convicted him and fixed his punishment at death. His motion for a new trial having been overruled, he prosecutes this appeal, relying upon three grounds for a reversal: (1) Error of the court in failing to grant him a new trial because of newly discovered material evidence which he did not and could not discover before the trial by the use of ordinary diligence. (2) Misconduct of the Commonwealth's attorney in his closing argument to the jury, and (3) actual bias of two of the jurors who sat in the case, as shown by the affidavits of witnesses discovered after the trial that the two jurors had formed and expressed an opinion adverse to the appellant before being accepted on the jury.

A disposition of ground (1) requires a brief statement of the substantial facts as shown by the record. Appellant was about thirty years of age and unmarried, while the deceased was thirty-six years of age, married, and resided at Livingston, Kentucky. They were both employed by the railroad company, appellant as a brakeman, and the deceased as a fireman. They were and had been acquainted with each other for some four or five years. They frequently met, and there is nothing in the testimony showing that there was any ill-feeling between them or that they sustained to each other anything less than the most cordial relations.

There appears to be some kind of division railroad office located at Paris, where the appellant resided, and the deceased was on the fatal day consulting with some of the railroad officers relative to being promoted from the position of fireman to that of engineer, and was in Paris on that day for that purpose. The appellant was not at work, because he was to be examined on that day for acceptance or rejection as a member of the army under the draft law.

About eight o'clock on the morning, appellant being as he says more or less disturbed over the prospects of being taken into the army took one drink of whiskey given him in a barber shop, and later in the day he bought some from a bootlegger and took several drinks of that. About four o'clock in the afternoon he and the deceased met at the restaurant where the homicide occurred, and according to the testimony of some five or six witnesses introduced by the Commonwealth they were talking pleasantly together, and in the language of the witnesses were "going in and out frequently," when about seven o'clock, while the deceased was talking to a drummer, and was eating some peanuts, the appellant came into the restaurant and shot him twice, without any words passing between them. Immediately Mr. Burton, one of the proprietors of the restaurant, and as soon as he could, grabbed the appellant, who still had his pistol in his hand, and the latter said: "This man has said enough for me to kill him." Burton asked for a surrender of the pistol, but appellant said to him, "No, I am not going to shoot any more." He then left the restaurant and went to the barber shop about one square distant and inquired if his nephew, a young Mr. York, was there, or had been there. He then came back to the restaurant with his pistol in his hand and requested that the police be telephoned for because he wanted to surrender. He was taken to the jail, where he has remained since.

In explanation of this apparent premeditated murder, the appellant testified that he had known the deceased as above stated; that he was the youngest of a family of thirteen children, the most of whom were girls, and that he was very much attached to his brothers and sisters, particularly to the latter; that about four years prior to the homicide the deceased had worked as an engineer at the plant of the Bond Lumber Company at Bonds, Kentucky, in the neighborhood of which the appellant,

his brothers and sisters were born and reared. One of his sisters married a man by the name of Dave York, and he says that some three or four years prior to the homicide the deceased got into a conversation with him in which the former asked him if he knew Mrs. Dave York and the deceased stated that she was running a disorderly house at Bonds, and in substance that she was unchaste and without virtue, using in the conversation, as testified to by appellant, language which we will not copy in this opinion. The appellant says that he did not then state to the deceased that Mrs. York was his sister, because he was somewhat wrought up and he thought it would be necessarily embarrassing, but he denied the charge and asserted that Mrs. York was a virtuous woman and he could prove it. He afterward got affidavits denying the charges made by deceased, including one from the man with whom he particularly charged Mrs. York with being familiar, and brought that information to the knowledge of the deceased, who, according to the appellant, accepted it as true and there was never afterward anything said between the parties concerning the matter until a few minutes or seconds preceding the shooting. He said that he entertained no malice nor any unkind feeling toward the deceased until the conversation immediately preceding the killing, which conversation was to this effect: that he walked out of the restaurant intending to telephone his boarding house that he perhaps would not be there for supper, and that deceased followed him out on the pavement and asked him what he (appellant) thought of his (deceased's) chances to be promoted from fireman to engineer, in answer to which appellant said in substance, "I don't see why you wouldn't stand a good chance for promotion, since you have been a good fireman, and had experience as an engineer down at Bonds," and that upon the mention of the name "Bonds" the conversation turned to the subject as to when either of them had been up there, deceased saying that he had not been there for some time, but was intending to go soon; that there was a woman up there, Mrs. Dave York, that he wanted to see, and used language describing the cheapness of her virtue, saying that he had the price, &c., and used with reference to her such scurrilous and slanderous language that we will not here incorporate it, whereupon the defendant replied, "You are a damn liar," when the deceased said "Go on home, you are drunk," and turned and went into

the restaurant. Appellant said that he became so enraged that he did not remember what happened after that until he fired the second shot, but he went almost immediately thereafter into the restaurant and committed the homicide. His explanation of his conduct is that he was so shocked and enraged at the accusation against his sister by the deceased after what had occurred some years before that he lost consciousness, and his attorneys insist that this, coupled with his partially intoxicated condition, produced emotional insanity sufficient to excuse him from the guilty consequences of his deed.

While some few witnesses, who are shown not to be on the best terms with appellant, testified to his bad character for peace and order, the greater weight of the testimony is that he was both peaceable and orderly in his association with his fellows; that he was industrious and energetic; that he possessed an excitable nature, was very much attached to his sisters, and would naturally become angry when their reputations were assailed.

In support of his motion for a new trial upon the ground of newly discovered evidence, appellant filed the affidavits of Thomas Gregory and J. B. Barrett, both of whom were unacquainted with either the appellant or deceased, and in which affidavits they state in substance that they were both in the city of Paris on the day in question, and that they were on their way to the depot, when, between six and seven o'clock, they passed the restaurant in question and saw two men standing in front of it near a telephone pole, and that in passing they heard the substance of the conversation testified to by appellant as having occurred between him and the deceased just in front of the restaurant, with reference to Mrs. York. The two affiants, after getting to the depot, and before the arrival of the train upon which they expected to depart, heard of a shooting down in town, but they did not connect it with the conversation they had heard, and went away. With these affidavits there was also filed that of the appellant as well as one by his attorney in which it appears that appellant had stated to his attorney that persons passed on the pavement at the time of that conversation but that appellant did not know any of them and the attorney had made a number of visits to surrounding towns and had exercised extraordinary diligence to discover some one who might have passed

and heard the whole or a part of that conversation, but without avail.

After appellant was convicted he addressed a pamphlet to the public in which he depicted his unfortunate situation and appealed for sympathy, as well as financial aid in prosecuting his defense, and one of these pamphlets seems to have come to the notice of Thomas Gregory, and from the statements made in it Gregory said that he became convinced that the conversation which he and Barrett heard in front of the restaurant was the one mentioned by appellant, and he afterwards divulged it and in that manner his and Barrett's testimony was discovered, and all of which occurred after the trial. So that there neither can be nor is there any complaint concerning the question of diligence in the discovery of that testimony. The only questions are—is it relevant and material, and if so, is it to be rejected because it might be considered cumulative? As a general proposition courts are somewhat reluctant to grant a new trial upon this ground, because it is one which opens a ready door not only for the commission of perjury, but for the perpetration of fraud by the party relying upon it. Notwithstanding, however, such reluctance, the courts will unhesitatingly grant a new trial for newly discovered evidence, when on account of its materiality and probable effect a manifest injustice would be committed to disallow it, and it may also here be stated that while this court, as well as others, announce and apply the general rule that a new trial will not be granted for newly discovered evidence which is cumulative only, still that rule is not of universal application, and where the newly discovered evidence, although to some extent cumulative in its nature, is of so controlling a character as that it would possibly change the verdict, it would be prejudicial error to refuse a new trial based on this ground. For authorities sustaining these general propositions, we refer to 16 Corpus Juris, 1191-1201; 20 R. C. L. 289, 296, 297; Gravitt v. Commonwealth, 184 Ky. 429; Crouch v. Commonwealth, 172 Ky. 463; C. N. O. & T. P. Ry. Co. v. Cecil, 164 Ky. 377, and other Kentucky cases cited in the notes of the publications referred to.

The defendant in the Crouch case was convicted for killing a man by the name of Wills. The shooting occurred near the depot, and when it was practically dark. The son of deceased had been arrested by officers for some misdemeanor, and the father was making demon-

strations to take him away from the officers, when the defendant Crouch, according to his testimony, asked the deceased to stay back and not interfere with the officers who arrested the boy, when the deceased cursed and drew a pistol and was about to fire when defendant shot him. After the trial he discovered a witness by the name of Ferguson who it seems was a prospective passenger waiting for the train and was standing close enough to see what occurred, and his affidavit corroborated the testimony of the defendant Crouch. A new trial was sought, and among the grounds relied on was the newly discovered testimony of Ferguson. There was no question of want of diligence in that case, as there is none in this case, but the judgment of conviction was reversed solely upon the ground of newly discovered testimony, although it was in its nature cumulative to that given by the defendant. The court in commenting upon the newly discovered testimony, its nature, materiality and probable effect, said:

"The testimony which Ferguson proposes to give bears upon the decisive facts of the homicide and from them the guilt or innocence of appellant can be most certainly determined. It is not cumulative or for the purpose of impeaching any witness who testified upon the trial. The witnesses who testified upon the trial, with the exception of Freeman Wills, deposed that they either did not or could not, at the time the mortal wounds were given, see the appellant and the deceased, and it is reasonable to conclude that other persons, if any there were, who may have been about the depot did not and could not see what transpired. The testimony of Ferguson will strongly corroborate that of appellant."

In the Cecil case, this court, quoting from the case of Torain v. Terrill, 122 Ky. 745, said:

"The rule that newly discovered evidence which is merely cumulative is not ground for a new trial allows of some exceptions. For instance, the rule does not apply if the newly discovered evidence, though cumulative, is sufficient to render clear that which was before a doubtful case, or if it is of a conclusive or decisive character, or of so controlling a character it would probably change the verdict. . . . Applications for a new trial are addressed to the sound discretion of the court, to be exercised according to the rules and usages of law, and the court should regard the substantial justice of

the case, equally remote from favoring negligence or exacting reasonable diligence.''

To the same effect are the cases of I. C. R. R. Co. v. Wilson, 31 Ky. Law Rep., 789; Adams Oil Co. v. Stout, 19 Ky. Law Rep. 758; Johnson v. Stephens, 95 Ky. 128; Berberich v. Louisville Bridge Co., 20 Ky. Law Rep. 467, and Owsley v. Owsley, 25 Ky. Law Rep. 1186. If the newly discovered testimony is material upon any vital issue in the case, and it is otherwise admissible, the fact that it is not directed to the establishment of the defendant's innocence of all crime will not cure the error in refusing to sustain the motion for a new trial therefor if the newly discovered evidence is directed to an issue which, if established, would reduce the degree of the crime as well as lessen the punishment inflicted. The question of supreme interest to a defendant in a criminal prosecution is, first, to establish his innocence of any crime, but if he should be unable to do that, he is next interested in reducing his offense to the lowest one for which he could be convicted under the indictment, and in capital cases the one is about of as much importance to him as the other. Thus, in 16 Corpus Juris 1208, the text says: ''Where newly discovered evidence will probably change the result to a verdict more favorable to defendant, a new trial should be granted.'' Crouch v. Commonwealth, *supra,* and Brooks v. Commonwealth, 144 Ky. 407. In the same volume of Corpus Juris on page 1209, in speaking of the rule with reference to capital cases, it is said: ''In a capital case even a grave doubt created by the newly discovered evidence may, in the interest of justice, require a new trial. Where the new evidence is not alone sufficient to require a new trial, nevertheless it may be considered in connection with other errors and irregularities on the trial as bearing on a defendant's right to a new trial.''

Whether the effect of the conversation immediately preceding the killing testified to by appellant alone, but which he seeks to corroborate by the discovered witnesses, would be sufficient to authorize a verdict of acquittal is a question with which we are not concerned. it being exclusively for the determination of the jury. But can we say that the establishment of that conversation would not affect the verdict in either reducing the severity of the punishment or the degree of guilt? Manifestly not. To do so would plainly ignore our knowledge of human nature obtained from observation and

experience. That knowledge teaches us that the conversation with reference to appellant's sister; if it occurred in the manner and at the time testified to by him, would have a tendency at least to provoke and anger the deceased to such an extent as to authorize the jury to find that he did not commit the deed with which he is charged with that degree of maliciousness and premeditation essential to the crime of murder, but that on the contrary he acted under sudden heat and passion, which, if true, would reduce his offense to that of voluntary manslaughter. Out of the frailties of our nature grow the distinction between the two grades of homicide, which distinction, from the dictates of reason and justice, has long been recognized and established as a part of the criminal law. Without further discussion we conclude that a new trial should have been granted on this ground.

Much evidence in the way of affidavits was introduced by both sides touching the character of the affiants Gregory and Barrett, and we might say that it was about equal in volume and weight, but whether their testimony is or not credible will be a question for the jury upon another trial, and not one for us to determine at this time.

To sustain ground (2) urged for a reversal, the bill of evidence shows a number of remarks made by the Commonwealth's attorney in his closing argument to the jury, of which complaint is made, but the only one we deem necessary to notice is that one charging defendant with being a "bootlegger." He also charged appellant with being a "pistol toter," and there was some evidence introduced to establish his reputation for that offense. This, however, was given by witnesses who were not on friendly terms with him. He admitted having the pistol on the occasion complained of, but explains that in finishing his run, which was Paris, on the evening before, he left his pistol in his overcoat pocket, and which he carried for the purpose of protecting himself in going from the railroad yards to his boarding house against waylayers and robbers with which the community was infested at that time. It is doubtful whether it is competent to prove one's reputation for a specific offense, but waiving that, we are convinced that there was absolutely no testimony in the record, direct or circumstantial, supporting the charge made by the Commonwealth's attorney that appellant was a boot-

legger. This court has time and again prescribed the limits within which counsel in their argument to the jury should be confined, and the general rule gathered from all the cases is that the proper bounds are overstepped when counsel goes outside of the record for the purpose of abusing and vilifying the opposing client and transgresses his rights and duties when he accuses such client of being guilty of a degrading offense to support which there is no testimony of any character in the record. Some of the cases from this court dealing with this question are Gilbert v. Commonwealth, 106 Ky. 919; Wilson v. Commonwealth, 21 Ky. Law Rep. 1333; Allen v. Commonwealth, 145 Ky. 409; Slaughter v. Commonwealth, 149 Ky. 5; Turpin v. Commonwealth, 140 Ky. 294; Howerton v. Commonwealth, 129 Ky. 482; Rhodes v. Commonwealth, 107 Ky. 534; Stroud v. Commonwealth, 160 Ky. 503; and Stearns Coal & Lbr. Co. v. Williams, 177 Ky. 698. The general tenor of all the cases cited, and others which might be, is that an attorney in his argument has no right to go outside of the record for the purpose of influencing the passions or prejudices of the jury, nor have they the right to assert as a material fact that which the testimony does not support, or which asserted fact is not to be deduced from other facts or circumstances proven, especially so if the statement consists in the unsupported charge that the one referred to is guilty of an independent offense calculated to render him obnoxious to the jury. It is a fact of which we may take judicial notice that the term ''bootlegger'' refers to one who engages in the unlawful sale of intoxicating liquors. We likewise know that in some cummunities, and with some people, scarcely any more opprobrious epithet could be applied to one than to call him a bootlegger. In such communities and before such people it is not difficult to see that the accusation would be calculated to cause the jury to regard the defendant with contempt and prejudice and to cause them to render a verdict against him which they might not otherwise do. At any rate it is impossible for us to say that such a charge would not so affect the verdict of the jury. It is sufficient for the purpose that the charge might produce upon the minds of the jury such adverse effect, and the objection to the statement should have been sustained and the jury admonished to not regard it. The court should have

at least done this much, there having been no motion to discharge the jury and continue the case.

What has been said renders it unnecessary to discuss or determine the questions relied on by ground (3).

For the reasons stated the judgment is reversed with directions to grant the defendant a new trial, and for proceedings consistent with this opinion, the whole court sitting.