## Addington v. Commonwealth

June 9, 1944.

Dissenting Opinion June 10, 1944.

Chenault Huguely and R. B. Baker for appellant.

Eldon S. Dummit, Attorney General, and Forest Hume, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE TILFORD—Affirming.

The appellant, Ernest Addington, was convicted of the crime of rape and sentenced to death.

Nora Coleman, the prosecuting witness, testified that her home is at Kings Mountain in Lincoln County; that she is nineteen years of age, and that for some time prior to December 19, 1942, she had been working in Cincinnati, Ohio; that during the afternoon of that date, she left Cincinnati by bus and arrived at Kings Mountain road where she got off the bus about 9 o'clock p. m.; that appellant, with whom she was acquainted, and one Oran Jones whom she did not then know, got on the bus at Stanford; that Addington, Jones, and Crit Coleman, to whom she was not related, and a man whom she did not know, got off the bus when she did; that all of them walked along Kings Mountain road toward her home

which was some two miles distant; that the man whose name she did not know turned off into a side road; and that after they had walked about a mile and a half, Oran Jones, who was behind her, caught her around the neck, pressed something into her back which he said was a gun, took her purse from under her arm, and, to quote her testimony, "at the same time Jones was doing this Addington walked around in front of Crit Coleman with a knife on his chest and told him to stop and to give him his money, and he says 'I don't have any money', and he says, 'Yes, you do', and he put his hand in his overall pocket up here and took a bill-fold out and took his money out of the bill-fold, and he had two pieces of white paper, and he says, 'I'll give this back to you'. I don't know what it was, but anyway he gave it back to him—and he told him—they told us they was going to kill both of us, and so Addington took—walked down the road and Jones took me up the road a few steps and told me that he was going to kill me. I—and we were begging and crying, we told him they had their money so why didn't they let us go, and they said they was going to kill both of us." The prosecuting witness then related how Jones had made her "walk over in the field just a little ways", and attempted to assault her; that "just as I started to run Ernest (the appellant) came up and caught me", whereupon, with each holding one of her arms, "they pulled me down through a field and shoved me through a fence, and I was crying and begging to let me go, but they said they wasn't—they said they was going to kill me, and one time they said they was taking me to Tennessee with them, and they said they was going to take me over there in the field or woods and kill me, and I begged—I kept begging them all the way, and they pulled me down through the other field, and that was down through almost two fields, and Jones shoved me down on the ground and Addington held the knife on me—" while Jones raped her, after which appellant raped her while Jones held a knife at her throat.

Crit Coleman fled as soon as he had been robbed, and hence did not witness what occurred in the field, but in relating what took place on the road immediately preceeding the rape, he testified:

"Well, sir, we was all going walking along out the road, coming out this side of the underground church house, there was a little road that turned off to the left.

Well, right back this side of that little road there was another one turned to the right. Well, this fellow with this suitcase, Prewitt, he set the suitcase down and stopped off there at that little road that turned to the left, and so we just kept walking along on out the road, and these boys kept coming on out, that is, Jones and Addington, and I was walking on one side of the road and Nora was walking on the other, walking along saying nothing to nobody, so this Addington boy walked up pretty close to me right just—oh, just on the yon side of the underground church just a little, why, he come right —right up—him and the Jones boy—right up between the—me and Nora, she was walking on the left and me on the right of the church, and just—just come walking right in front of us, and Addington said, 'I'll take care of him and you take care of her', and he just made a grab then and grabbed her around the waist, so Mr. Addington run right around in front of me with a pocket knife and said, 'Stick them up, you God d—n son of a b—, you,'and so I—just like anybody else—I stuck them up, this hand (indicating), and this hand (ind.) —I had my groceries on my back, holding my groceries with this hand, so then I just let this hand down and took this hand and held my groceries and held this hand up. 'Well,' he said, 'give your money up'. I said, 'I ain't got no money, Mister'. He said, 'You are a d—n son of a b— and liar, you have got money'. I says, 'No I haven't got no money'. He said, 'Yes, you have', he said 'Give that money up', he says, 'I'll gouge this knife through your heart'. I said, 'Big boy, I haven't got no money', and so he just went to unbuttoning my jacket down here (ind.) with one hand and held the knife on me with the other, and so he just went right on in this pocket with his hand and begin to rake the money out. Well, I had $60.00 in this pocket—

"The Court: There is no use going into that. Get to this other matter, Mr. Rankin.

"Q. Well now, after that where did you go to? A. Well—

"Q. Did you hear him and Jones make any threats to your life and to her life? A. Yes, sir.

"Q. What did they say? A. Well, Addington there said that he was going to kill us both and put us in the underground church house, that dead bodies wouldn't tell nothing."

At the conclusion of Coleman's direct examination, the Court, without being requested to do so, admonished the jury as follow: "Now, gentlemen, the Court wishes to remind the jury of this: That you are not trying the defendant here on the charge of robbery. You are trying him on the charge of rape. The testimony here with regard to the defendant taking money either from Nora Coleman or Crit Coleman is competent for you to consider only in connection with the other charge, that of rape, in the event that you think it has any bearing on whether or not that other occurrence took place as Nora Coleman claims it did."

It is insisted by appellant that so much of the foregoing testimony as related to the robbery of the prosecuting witness and Crit Coleman was incompetent under the rule that proof of crimes other than that for which the accused is being tried is inadmissible, and that if admissible as an exception to the general rule, the Court's admonition to the jury as to the purpose for which it might be considered was erroneous. One of the exceptions to the rule prohibiting the proof of other crimes is that the exclusion does not extend to crimes, so interwoven with the offense for which the accused is being tried that the evidence of the two acts cannot be separated (Conley v. Commonwealth, 273 Ky. 486, 117 S. W. 2d 189); and we are of the opinion that the testimony complained of was within that exception. Farley v. Commonwealth, 263 Ky. 769, 93 S. W. 2d 858. In any event, the appellant failed to object to the testimony complained of, or to request any admonition limiting its effect. In the case of Farley v. Commonwealth, supra, it was expressly held that the failure of the accused to request an admonition from the Court as to the purpose for which similar testimony might be considered, although the accused had objected to its admission, waived any right he might otherwise have had to such an admonition. Therefore, even if we were convinced that the admonition required when such proof is admitted to establish motive, identity, etc., is essential in cases such as this where the reason for its admission is that the offenses are so closely related in point of time as to render it impracticable to fully prove the offense charged without proving the others, we would not be warranted in holding that the right to the admonition was not waived by a failure to request it. The admonition which the Court gave may accordingly be regarded as a gratuity, which, although it

did not specifically inform the jury why the testimony referred to was admitted, nevertheless warned them that the appellant was being tried for the offense of rape alone, and, from whatever standpoint viewed, cannot be said to have prejudiced any of appellant's substantial rights.

The other major ground on which appellant seeks a reversal is that the county attorney who prosecuted the case said to the jury in his closing argument: "We are asking you to render a death penalty in this case, and if you should convict this man and send him to the penitentiary for 20 years, it would do him no good. If he should serve a sentence of 20 years he would be then about 40 years old and he would be the same bad man when he reached 40 as he is now, and further, Gentlemen, whenever a twig is bent one way it is going to stay that way and have a knot on it even at the end of 20 years. And, further, Gentlemen, Mr. Baker and Mr. Huguely both know that this man is guilty in spite of all of their efforts in this case."

In justice to the County Attorney it should be said that his affidavit discloses that the statements which he made were: "Gentlemen, the twig is already bent and set. By the end of twenty years it will be hardened into a knot." And "I believe Gentlemen of the jury that both Mr. Huguely and Mr. Baker believe their client is guilty because neither of them have made any serious argument as to his innocence, the major portion of their argument being devoted to a plea for mercy."

But the bill of exceptions recites that the County Attorney "in substance" made the statement first quoted and we are bound by the bill which further shows that appellant objected to the quoted argument, and that his objection was overruled. We must therefore determine whether the argument was improper, and if so, whether it was prejudicial to appellant's substantial rights.

As to that portion of the argument relating to the noneffectiveness of a penitentiary sentence in this particular case, we have no hesitancy in concluding that it was but a presentation of a permissible deduction which the jurors, from their knowledge of human character in general, might themselves have reasonably drawn from the facts shown by the evidence.

Conceding the impropriety of the County Attorney's

statement that appellant's counsel knew that their client was guilty, we think that it can properly be said to have prejudiced appellant's substantial rights only in the event that it was susceptible to the interpretation that appellant had confessed his guilt to his attorneys. It can, of course, be argued that appellant's attorneys could not have known that he was guilty unless he had confessed, but, on its face, such a construction is a strained one. Especially does it appear strained when it is considered that the words were spoken in a court room where it is customary for lawyers to declaim that what they contend for is so clear that all who have heard the case must know the truth of their contention. We therefore think that the proper interpretation of the objectionable language, and the one which a jury would certainly place upon it, is that because of the evidence introduced the accused's attorneys must know that he is guilty. So interpreted, the argument expressed a deduction which could have been drawn from the persuasiveness of the Commonwealth's evidence. Hence, we would not be justified in holding that it was prejudicial to appellant's substantial rights. Music v. Commonwealth, 186 Ky. 45, 216 S. W. 116; Underwood v. Commonwealth, 266 Ky. 613, 99 S. W. 2d 467.

The defense was an alibi wholly insufficient to justify the belief that any intelligent jury would accept it in the face of the Commonwealth's clear and uncontradicted proof that the crimes were committed at the time and place testified to by the prosecuting witness, and that appellant perpetrated the offense with which he was charged. It is stated in the briefs that Jones, who was equally guilty, was given a sentence of only 20 years after two juries had been unable to agree; that appellant did not have sufficient time or the means with which to prepare his defense, and that hearsay testimony was admitted against him. But the record fails to disclose that appellant's counsel requested further time, or that they could have better prepared appellant's defense had it been granted; and the testimony of which they complain was admitted without objection. Why it was more difficult to convict Jones, or why he was given a lighter penalty we are, of course, unable to say; but it does appear from the record before us that the prosecuting witness and Crit Coleman could not have been mistaken in their identification of appellant since they had known him previously, whereas, they had never seen Jones, a

visitor in the neighborhood, until the day the crime was committed.

Judgment affirmed.

Whole Court sitting.

Judge Sims dissenting.

I am constrained to disagree with my brethren that the closing argument for the Commonwealth was not prejudicial to defendant when the County Attorney said, "And further, Gentlemen, Mr. Baker and Mr. Huguely both know that this man is guilty in spite of all their efforts in this case." When defendant's objection thereto was overruled by the trial judge the jury were in effect told that this argument was proper and that when they retired to their room to consider the case immediately following this closing argument they might consider the fact that the accused's counsel knew he was guilty. It is inconceivable why any trial judge would not have sustained an objection to such argument, or why this court would not hold it prejudicial to defendant.

Criminal trials must be conducted according to rules prescribed for that purpose. I have been unable to find a better statement of the law in this jurisdiction concerning improper arguments than is contained in Music v. Commonwealth, 186 Ky. 45, 216 S. W. 116, on page 121 (cited in the majority opinion), where it is written: "The law in such cases recognizes the frailty of human nature, and that in the heat of argument inappropriate remarks are liable to be made; but unless they are altogether unfounded from any fact or circumstance appearing in the case, and manifest such a wide departure from legitimate deductions as to be at once poisonous and prejudicial, a reversal will not be ordered for that reason alone. But if the complained of remarks are entirely foreign to anything appearing in the case, and if they were made for the purpose of taking an undue advantage, and such was their probable effect, it is the duty of the court to reverse the judgment rendered upon a verdict so obtained."

In the instant case the complained of remark was entirely foreign to any thing appearing in the record and could have been made for but one purpose, and that was to take undue advantage of the defendant. If such

was its probable effect, then this case should be reversed. Of course, under the state of this record it is impossible for this court to state the exact effect of this argument on the jury, but in all probability it caused the jury to return a death penalty, because Jones, who was defendant's alleged companion in this crime and the leading spirit and apparently the more guilty of the two, was given on a separate trial the penalty of confinement in the penitentiary for 20 years.

Let it not be forgotten that this was the closing argument. The lips of defendant's counsel were closed. All they could do was to object, and when the court overruled their objection and approved this grossly improper and highly inflammatory argument, they were as helpless as one struck by lightning.

It is the usual conception of the public and of persons serving on juries that one accused of crime divulges all to his counsel. When the County Attorney so far overstepped the bounds of propriety as to tell the jury that defendant's counsel knew he was guilty, it was equivalent to telling that body that defendant had confessed his guilt to his attorneys. I cannot accept the specious reasoning of the majority that the objectionable words only meant that from the strong proof of the Commonwealth defense counsel must know their client was guilty.

If the zealous counsel representing the Commonwealth had said, "Judge Alcorn knows this man is guilty," and had the judge overruled an objection thereto, would this court hold that such an argument was not prejudicial? It is an accepted fact by jurors and all persons in any way connected with a criminal trial that defense counsel are in a much more advantageous position than the trial judge to know whether the accused is guilty of the crime for which he is under trial.

When the motion for a new trial was heard the County Attorney filed his affidavit setting out his argument in different words from those appearing in the bill of exceptions. While the majority opinion says this court cannot consider this affidavit and that it is confined to what appeared in the bill of exceptions, yet the affidavit must have had some influence with the majority, otherwise it would not have been set out in their opinion.

Section 272 of the Criminal Code of Practice says a juror is not a competent witness to attack a verdict, therefore defendant could not have used any member of that body as a witness on the hearing of his motion. But the Commonwealth was not precluded from using members of the jury as witnesses to show that this grossly improper argument did not influence the jury in returning a verdict of death. Gleason v. Com., 145 Ky. 128, 140 S. W. 63, Ann. Cas 1913B, 757; Howard v. Com., 69 S. W. 721, 24 Ky. Law. Rep. 612; Wolf v. Com., 214 Ky. 544, 283 S. W. 385. The County Attorney must have known his affidavit as to what argument he made could not properly be considered by this court and that we are confined to what appears in the bill of exceptions. The bill does not show the argument as stated in his affidavit. Also, he doubtless knew that he could have introduced members of the jury who tried this case and have incorporated their evidence in the bill of exceptions to show that the argument so vigorously complained of did not influence the jury in returning a verdict of death. It must be assumed the reason he did not introduce members of the jury as witnesses on the motion for a new trial is that no juror would testify he was not influenced by the improper argument.

The mind is the most delicate, intricate and unpredictable of all human mechanism. No one can look at another and say of what he is thinking, or as to how certain words or events may affect him emotionally, or as to what mental reaction they may produce. It is only those possessing occult powers, a crystal ball, a magic wand and enchanted words, who can read human thoughts and predict human emotions. The educated have no great confidence in those who lay claim to such supernatural powers. It is worthy of note that the law does not say if this court thinks that an improper argument affected the jury the judgment must be reversed, but the legal writers wisely realized it is impossible to probe the mind of a human miles away, whom the judges have never seen, and they have said if such argument probably affected the jury in reaching its verdict, there is ground for reversal.

The same Judge of this court who wrote the opinion in the Music case, 186 Ky. 45, 216 S. W. 116, had this to say on the subject of improper argument in Johnson

v. Com., 188 Ky. 391, 222 S. W. 106, 111: "At any rate, it is impossible for us to say that such a charge (defendant was called a boot-legger) would not so affect the verdict of the jury. It is sufficient for the purpose that the charge might produce upon the minds of the jury such adverse effect, and the objection to the statement should have been sustained and the jury admonished to not regard it."

Here a man's life is involved. The closing argument is admitted by the majority of this court as being highly improper. It could have been made only to gain an undue advantage of the defendant. Otherwise, why did the County Attorney make it? While short, it was a most ruthless and effective attack on two honorable attorneys, who as officers of the court were the only persons connected with the trial who were serving without remuneration in an official, if not patriotic, capacity. The jury were told these gentlemen knew their client was guilty and when they resorted to the only shield they possessed—their right to object—the trial judge knocked it from their hands, and in effect said to the jury, "Yes, gentlemen of the jury, defendant's counsel who are officers of this court know he is guilty".

Immediately following this improper argument and its approval by the court, the jury retired to consider the case and returned a verdict of death. In another trial where no such argument was made, Jones, who was the ring-leader, was given 20 years in prison. Yet, the majority of this court says such argument could not have affected the jury because if it was probable that it could, or if it might have, then under the rule in this jurisdiction it is the duty of this court to reverse the judgment. Music v. Com. 186 Ky. 45, 216 S. W. 116; Johnson v. Com., 188 Ky. 391, 222 S. W. 106.

It just does not strike the human mind as reasonable to say in the circumstances presented by this record that such argument was not prejudicial.

As prejudicial to defendant as were the words of the County Attorney, their effect was increased ten-fold when the trial judge erroneously overruled the objection of defense counsel. This fact the majority opinion ignores. Attention is called that in each of the two cases cited in support of the majority opinion the trial court

sustained an objection to the complained of words, and in one of them the offending attorney withdrew the statement to which objection was made.

It was written in Ayers v. Com., 195 Ky. 343, 242 S. W. 624, 628, that despite defendant's character or the crime with which he is charged he "is entitled to at least one tolerably fair trial." Due to the highly improper and inflammatory argument, which the trial judge approved and which were the last words heard by the jury before their retirement to consider the case, it strikes me that this defendant did not have even a tolerably fair trial.