Neil W. ASHE, Appellant,

v.

UNITED STATES of America, Appellee (two cases).

Nos. 13927, 13928.

United States Court of Appeals Sixth Circuit.

April 10, 1961.

Clyde W. Key, Knoxville, Tenn. (Frederick Zissu, New York City, on the brief), for appellant.

John F. Dugger, Asst. U. S. Atty., Knoxville, Tenn. (John C. Crawford, Jr., U. S. Atty., Knoxville, Tenn., on the brief), for appellee.

Before MILLER, Chief Judge, and CECIL and O'SULLIVAN, Circuit Judges.

O'SULLIVAN, Circuit Judge.

Defendant-appellant, Neil W. Ashe, appeals from judgments entered on a jury's verdict convicting him on all counts of two indictments which charged him with violation of Section 145(a) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 145(a). He was sentenced to eighteen months imprisonment on each of six counts, the sentences to run concurrently.

In the indictment involved in appeal No. 13,927, he was charged, in separate counts for each year, with filing on behalf of Ashe Hosiery Mills of Knoxville, Tennessee, a Corporation of which he was President, false and fraudulent income tax returns for the calendar years of 1950, 1951 and 1952. In the indictment involved in appeal No. 13,928, he was charged, in separate counts for each year, with filing on behalf of himself and his wife, false and fraudulent income tax returns for the calendar years of 1950, 1951 and 1952. All counts of each indictment charged that the offenses were committed in the Middle District of Tennessee by filing the respective returns with the Collector of Internal Revenue at Nashville. In Bills of Particulars, supplied upon defendant's motions therefor, the government averred that the respective returns were signed and the alleged wilful and fraudulent intent occurred in the Northern Division of the Eastern District of Tennessee, in which the City of Knoxville is located.

For reversal the defendant claims: *First*, that there was not substantive evidence to support a verdict of guilty and the court should have directed his acquittal on all counts. *Second*, that the district judge erred in giving and refusing various instructions to the jury. *Third*, that the offense charged in the first count of each indictment was barred by the Statute of Limitations. *Fourth*, that there was a fatal variance between the third count of each indictment and the proofs, in that on March 13, 1953, the date of filing of the 1952 returns, the office of "Collector of Internal Revenue" had been abolished and that of "Director of Internal Revenue" created. The third count of each indictment charged that the return for 1952 had been filed with the "Collector of Internal Revenue." *Fifth*, that the district judge erred in denying his motion for new trial, made on the ground of newly discovered evidence. This motion was made after the appeals had been originally docketed in this court. We shall discuss these contentions in the above order.

*First. Should an acquittal have been directed?* Since about 1917, appellant had, with his father and brother, been engaged in the business which at the time of the events here involved was known as the Ashe Hosiery Mills. In 1937, an accountant, Leonard Barker, was employed by the Ashe business. He was described by defendant as a financial genius in whom defendant and others of his family had a "childlike" confidence. For some years prior to 1950, the first tax year here involved, the said Barker maintained a bank account at the American National Bank and Trust Company in Chattanooga, Tennessee, under the style of "Yarns Associated." During the years in question, and in prior years, substantial amounts were withdrawn from the funds of Ashe Hosiery Mills by its checks signed by appellant, as its President, payable to Yarns Associated, and the proceeds deposited in the Yarns Associated account—$16,637.24 in 1950, $20,425.84 in 1951, and $12,472.28 in 1952. The amounts of these checks were set up on the books of Ashe Hosiery Mills as paid out for the purchase of yarn and deducted on its income tax returns as part of the cost of doing business. The government claims that no such purchases of yarn were actually made. The evidence showed that, except for a few relatively small, unidentified withdrawals, and an amount paid to Leonard Barker in 1950 of $1,019.63, the monies thus paid by Ashe Hosiery Mills to Yarns Associated were paid out by Yarns Associated either to defendant Ashe, or to his sister-in-law, Irene Ashe. The amounts paid to Irene Ashe were in payment of promissory notes given by defendant at a time in 1948 when he purchased from her, his deceased brother's widow, the shares of stock that his brother had owned in the Ashe Hosiery Mills. In 1950 there was thus paid to Irene Ashe from the Yarns Associated account the sum of $14,547.00; in 1951, such payments to Irene Ashe totalled $13,881.72, and in that year there was paid from the Yarns Associated account directly to defendant, $1,500.00; in 1952, like payments from

Yarns Associated were made to Irene Ashe in the sum of $4,479.48, which amount paid off the last of defendant's stock purchase notes, and in that year there was paid directly to defendant the sum of $6,000.00. Leonard Barker handled the mechanics of making these payments by purchasing with Yarns Associated checks cashier's checks in the respective amounts of such withdrawals.

The deduction of the monies thus paid to Yarns Associated by Ashe Hosiery Mills from the gross income of Ashe Hosiery Mills as the cost of yarn purchased was the basis for the indictment involved in appeal No. 13,927. None of the monies paid to Irene Ashe on the stock purchase notes, or money paid directly to defendant from the Yarns Associated funds, were reported by defendant as income received as dividends, or otherwise from the corporation. Such conduct was the basis of the charges made in the indictment involved in appeal No. 13,928.

In November, 1947, defendant's brother, Ragon Ashe, died owning 452½ shares of the capital stock of Ashe Hosiery Mills. An agreement had existed between defendant and his brother providing that upon the death of either the survivor would purchase the shares of the deceased at their book value. On January 13, 1948, a contract was drafted by an attorney representing the widow and the estate of the deceased Ragon Ashe, providing for the purchase by defendant of the said 452½ shares at a price of $158.34 per share. Of the total price of $71,648.85, the sum of $15,121.47 was paid in cash at the closing of the deal, and the balance of $56,527.38 was payable in 51 monthly installments. Each installment was evidenced by defendant's note for $1,108.38. Certificates for the stock so purchased by defendant, (452½ shares) were issued in his name. Fifty-one certificates, each for seven shares, were endorsed in blank by defendant and delivered as collateral for the unpaid notes. One such certificate was pledged with each note of $1,108.38. A contract evidencing the entire transaction was signed by defendant at the attorney's office at the time of closing.

Evidence was received of the use made of the Yarns Associated account for the period from January 1, 1946, through December, 1952. This evidence disclosed a continuing practice of payments made to such account by Ashe Hosiery Mills with such monies being redistributed directly to defendant, to pay his liability for purchase of his deceased brother's stock, to pay for some additional shares purchased by him from third persons, and to pay some substantial accounts owed by Ashe Hosiery Mills for construction of additions to its plant. A composite of such transactions showed that for the period above mentioned, a total of $160,858.30 paid to Yarns Associated by Ashe Hosiery Mills was redistributed as follows: to defendant Neil W. Ashe, $61,438.80; to Irene Ashe, (for stock purchased by defendant) $57,449.18; to one Darnall, $3,576.75; and to one Hutsill, $7,647.75. These latter two amounts represented the cost of stock in Ashe Hosiery Mills purchased from Darnall and Hutsill by defendant. An amount of $30,745.82 was paid to business firms for work done for Ashe Hosiery Mills.

The defendant, a witness in his own behalf, gave the following explanation of the above transactions. As to the money received by him from the Yarns Associated account, he claimed that it represented repayment of loans made by him to Leonard Barker. The payments to Darnall and Hutsill, in the amount of $11,222.57 for stock purchased by defendant from them, were made by Barker out of Yarns Associated account in repayment of Barker's borrowings from Ashe. Defendant claimed that most of the money loaned by him to Barker came from savings that defendant had accumulated over a period of years and which he had kept in cash in the company safe. It had reached a total of about $30,000.00 at one time. He claimed that outstanding loans to Barker were as much as $25,000.00 at one time. The only record kept of these loans was

a little book in which were noted the various loans and the repayments made thereon. The little book had been destroyed. During the course of the Internal Revenue Department's investigation of the tax returns involved, defendant with his attorney and his then accountant attended a conference. A stenographic record was made of a sworn statement then made by him. He then denied that he had ever had any personal transactions with Yarns Associated. Asked directly whether he had ever loaned any money to Barker, he replied, "Not that I recall." He then also asserted that he had never accumulated any cash funds which he had hidden in a secret place. On the trial, he charged these very crucial admissions to his faulty memory at the time they were made.

Defendant produced two employees of Ashe Hosiery Mills, one his son-in-law, who testified that yarn was actually purchased and received by Ashe Hosiery Mills from Yarns Associated. On this appeal, it is claimed that the government produced no evidence to overcome such testimony. The government produced two former secretaries of Leonard Barker, the alleged proprietor of Yarns Associated. Both testified that during the time in question they never knew of Barker ever buying or selling any yarn and never heard Barker conduct any business relating to Yarns Associated; that some letterheads with the name of Yarns Associated were kept in a filing drawer, but they never used them for any purpose. During the course of the government's investigation, the defendant's representatives, after some delay, produced a large number of so-called invoices for yarn allegedly purchased by Ashe Hosiery Mills from Yarns Associated. These were not on regular invoice forms, but were typed on letterheads. Witnesses for the government gave testimony concerning these from which a jury could well conclude that they were spurious. What bank records of Yarns Associated were available failed to disclose any payments ever made by Yarns Associated for purchase of yarn

allegedly sold to Ashe Hosiery Mills or to anyone else. There was much other evidence introduced by the government which, with the above, raised a factual issue as to the genuineness of the alleged yarn transactions between Ashe Hosiery Mills and Barker's Yarns Associated.

Defendant's explanation of the fact that some $71,000 was withdrawn from the Yarns Associated account to pay for Ashe's purchase of his deceased brother's stock was that he was not the real purchaser, that Barker was the purchaser and used defendant's name. He said he signed whatever papers Barker asked him to sign—viz., fifty-one promissory notes, the underlying contract, and endorsed in blank fifty-one certificates for the stock purchased and pledged as collateral to such notes. The evidence showed that a check from Yarns Associated, payable to defendant, was used by him to acquire two cashier's checks which were used to make the initial payment of $15,-121.47 for the brother's stock. Defendant issued his personal check to pay the first installment note. The attorney who handled the transaction testified that at the conclusion of the conference at which it was effected, defendant requested the attorney to furnish him with a schedule of the maturity dates of the installment notes. There was evidence that defendant was the one who suggested the rate of interest to be charged on the notes. The notes and stock certificates were turned over to Leonard Barker at the conclusion of the transaction in the attorney's office and Barker handled the payment of the notes as they came due. Neither the notes nor the stock certificates were produced at the trial. Defendant testified that he never saw them after they were delivered to Barker.

In the summer of 1954, Leonard Barker disappeared. He was subsequently indicted for failure to file his own income tax returns for the years 1950, 1951 and 1952, and for aiding and abetting various of his clients, including defendant and the Ashe Hosiery Mills, in filing false and fraudulent returns for those years. He was never apprehended and his where-

abouts were unknown until late 1959 when he was located at Brighton, England. This was after the conviction of defendant and the docketing of the appeals here involved.

■ Defendant contends that except for his own extra-judicial admissions to government agents, there was no evidence to overcome his trial testimony that monies paid to him out of Yarns Associated account were repayments of his loans to Barker. Relying on Smith v. United States, 348 U.S. 147, 75 S.Ct. 194, 99 L.Ed. 192, he asserts that such extra-judicial admissions are not sufficient to overcome his trial testimony in the absence of some corroboration of their content. We are satisfied that, if needed, there was ample evidence to corroborate defendant's pre-trial extra-judicial admissions, which admissions had definitely negated his trial claim that money received by him from Yarns Associated was in repayment of loans made to Barker.

■ No purpose would be served by review of other evidence which, with the foregoing, did, in our opinion, make an issue for the jury as to the truth of defendant's explanations. There was abundant evidence from which the jury could find the defendant guilty beyond a reasonable doubt on all counts. The district judge correctly denied the motion for acquittal.

*Second. The Court's Charge.* The district judge instructed the jury:

> "If there should be any evidence in the case that has created a reasonable doubt in your minds of the guilt of the defendant, then the case is not made out beyond a reasonable doubt."

The vice claimed to exist in the above is that it did not specifically state that "want of evidence" could also create reasonable doubt. The above quoted part of the court's charge is but one sentence extracted from the court's very complete and sound charge on reasonable doubt. He did not use the words, "want of evidence," neither was he requested so to do. From hearing his entire charge re-

lating to the government's burden to prove all of the essential elements of the offense charged by direct or circumstantial evidence, beyond a reasonable doubt, the jury could not fail to understand that a reasonable doubt could arise from a "want of evidence" as well as from the positive evidence. The opinion in the case relied upon by defendant for his position, Singer v. United States, 3 Cir., 278 F. 415, 418, did abstractly say that, "the reasonable doubt contemplated by the law must arise from the evidence, which includes, within the term, *want of evidence* \* \* \*." At the same time, the court held sufficient a charge that defined reasonable doubt as one "arising from the evidence" with no specific reference to "want of evidence." The charge thus approved in the Singer case was patterned after a charge on reasonable doubt approved in the case of Agnew v. United States, 165 U.S. 36, 17 S.Ct. 235, 41 L.Ed. 624.

■ The defendant proffered no request containing the language he now suggests as essential, and made no objection to the court's charge on reasonable doubt. He is not in position now to complain. Rule 30, Federal Rules of Criminal Procedure, 18 U.S.C.A.; Jackson v. United States, 6 Cir., 1950, 179 F.2d 842; Stanley v. United States, 6 Cir., 1957, 245 F.2d 427. Apart, however, from the requirement of Rule 30, we are satisfied that, reading the court's charge as a whole, which of course we must do, Heindel v. United States, 6 Cir., 1945, 150 F.2d 493; Spaeth v. United States, 6 Cir., 1956, 232 F.2d 776, 62 A.L.R.2d 606 it fully and fairly advised the jury on the subject of reasonable doubt.

■ Complaint is made also of the language employed by the trial judge in instructing the jury as to their consideration of defendant's claimed reliance on the advice of Leonard Barker. No objection was made to the instruction as given. The defendant was not attempting to excuse errors in the tax returns because of advice of his accountant. His defense was that the returns were correct. The

criticized instruction advised that for the defendant to be excused for acting on the advice of his accountant, he was required to show that he, in good faith, relied on it. We will not find reversible error in this charge in the absence of defendant's compliance with Rule 30 of the Federal Rules of Criminal Procedure by asking the trial judge to cover the subject in language more acceptable to defendant. Jackson v. United States, 6 Cir., 1950, 179 F.2d 842.

Defendant requested the court to charge the jury as follows:

"The acts here involved are the filing of inaccurate tax returns. In the complexity of successive tax laws, many thousands of taxpayers do that innocently. Such filing is unlawful, however, only if made wilfully, with knowledge of its falseness and with intent to evade taxes. There is no presumption that may be drawn from the act itself—both knowledge and wilfulness must be established by independent proof, direct or circumstantial—and that beyond a reasonable doubt."

■ He calls attention to the fact that the above language, with the exception of its reference to reasonable doubt, was used by Judge Simons of this court in the case of Lurding v. United States, 6 Cir., 1950, 179 F.2d 419, 422. Judge Simons language was not used in discussing what instruction should be included in a judge's charge in such a case as this. We are satisfied that the court fully advised the jury as to the government's burden of proving that defendant signed and filed the returns involved wilfully, knowingly and with intent to evade taxes. We find no reversible error in this regard. Heindel v. United States, supra; Spaeth v. United States, supra.

■ *Third. Did the Statute of Limitations bar prosecution of the offenses charged in Count I of the Indictments?* The first count in each of the indictments charged that the offense was committed on May 15, 1951, that being the date of filing of the corporate and the defendant's individual income tax returns for the year 1950. The indictments were returned on July 18, 1957, more than six years from May 15, 1951. It appears, however, that complaints were filed on May 8, 1957, and defendant was arraigned before a Commissioner on May 13, 1957. The indictments were returned prior to the discharge of the Grand Jury at its session next to the time of filing of the complaints. The Statute of Limitations was thus tolled (§ 3748, I.R.C. 1939, 26 U.S.C.A. § 3748). The complaints as well as the indictments charged that the offense was committed in the Middle District of Tennessee, which includes the City of Nashville, wherein the office of the Collector of Internal Revenue was located, and at which office the tax returns involved were filed. Following the return of the indictments, the defendant moved for bills of particulars to require the government to specify where the involved tax returns were signed and where the acts relied upon as showing fraudulent intent had been committed. The responsive bills of particulars set forth that the returns had been signed at Knoxville in the Eastern District of Tennessee and that, "all acts of defendant showing wilful and fraudulent intent occurred in the Northern Division of the Eastern District of Tennessee except for the technical filing of the returns at Nashville, Tennessee." Thereupon the case was, pursuant to Rule 21(b) of the Federal Rules of Criminal Procedure, and on defendant's motion, transferred to the Eastern District of Tennessee. This was because the indictments, supplemented by the bills of particulars, disclosed that the charged offense was committed in more than one district. Such was proper procedure, United States v. United States District Court, 6 Cir., 1954, 209 F.2d 575.

■ Because of the foregoing, defendant argues that the filing of a complaint did not toll the statute, averring that the complaint did not set forth the same offense charged in the indictment as supplemented by the bill of particulars. We find no merit in such claim. The

complaints charged the same offenses as were charged in the indictments. The bills of particulars did not change the indictments' description of the offenses charged.

■ *Fourth. Variance between evidence and offense charged in Count III of each indictment.* Each indictment charged, in Count III, that the offense alleged had been committed by filing a tax return with the *Collector* of Internal Revenue on March 13, 1953. As of that date, the *Collector* of Internal Revenue had become the *Director* of Internal Revenue. We find no merit in this contention.

■ As to subjects Third and Fourth hereinabove discussed, we mention also that appellant-defendant was convicted on all three counts of each indictment and received concurrent sentences. No attack is made as to the sufficiency of Count II of each indictment, nor is it claimed that prosecution thereunder is barred by the Statute of Limitations. The concurrent sentences imposed did not, together, exceed that which could have been given for the offense charged in Count II. In such case, a judgment of conviction will ordinarily not be reversed because of some insufficiency in the other counts. Clift v. United States, 6 Cir., 1927, 22 F.2d 549; Coleman v. United States, 6 Cir., 1920, 268 F. 468; United States v. Smith, 7 Cir., 1958, 253 F.2d 95, certiorari denied 357 U.S. 919, 78 S.Ct. 1360, 2 L.Ed.2d 1364.

*Fifth. Should a new trial have been granted on the ground of newly discovered evidence?* Judgments of conviction were entered in these causes on March 27, 1959. After appeals therefrom were docketed and on January 14, 1960, defendant made a motion for new trial on the ground of newly discovered evidence. Such motion, and supporting affidavits, disclosed that subsequent to the trial, defendant and his attorney had located Leonard Barker in Brighton, England. Defendant's son-in-law went to England and obtained an affidavit from Barker wherein he deposed that he had read over a transcript of the testimony given by defendant Neil W. Ashe at his trial in the cases before us, and that insofar as such testimony related to financial transactions between Neil W. Ashe, Ashe Hosiery Mills, Irene Ashe, Yarns Associated and Leonard Barker, such testimony of defendant Ashe was true. The affidavit further gave Barker's version of the activities of himself and defendant in relation to the matters involved in the affairs which were the background to the indictments returned against defendant Ashe.

Other affidavits filed with the motion for new trial detailed the efforts of defendant, his agent and attorneys to earlier locate Barker, thus to support their claim that due diligence had been exercised in attempting to locate Barker and have his testimony available at the trial of these cases in February of 1959. The government filed affidavits opposing the motion, detailing facts which it is claimed demonstrated that the defendant not only failed to diligently seek to have Barker's testimony at the trial, but was actually anxious that Barker not be found. Following the making of the motion for new trial, which disclosed the locating of Barker in England, a special agent of the Intelligence Division of the Internal Revenue Service was sent to England. Assisted by some members of the Brighton Police Department, he interviewed Barker. An account of the investigation of these officers was contained in their affidavits filed in opposition to defendant's motion. They disclosed that Barker refused to discuss relevant matters with them without the presence of his personal attorney and an attorney representing Ashe Hosiery Mills. These affidavits purported to cast some suspicion upon the belated location of Barker and the method of obtaining his affidavit. Barker's affidavit averred that he was willing to give his testimony by deposition concerning the matters contained in his affidavit.

The district judge denied the motion for new trial, announcing his opinion that if Barker testified to the contents of his affidavit, his evidence "would be

cumulative only" and, likewise, that such evidence "would not probably produce an acquittal \* \* \* his testimony would not have changed the results of the trial."

■ The motions were made under Rule 33 of the Rules of Criminal Procedure while appeals were here pending. Inasmuch as the district judge denied the motion, it was not necessary for him to await a remand from this court. United States v. West, D.C., 170 F.Supp. 200, 203; Smith v. Pollin, 1952, 90 U.S. App.D.C. 178, 194 F.2d 349, 350; Knight v. United States, 5 Cir., 1954, 213 F.2d 699; United States v. Minkoff, 2 Cir., 181 F.2d 538. The denial of the motion pending appeal was procedurally correct.

■ The disposition of a motion for new trial upon newly discovered evidence rests in the sound discretion of the trial judge. Winer v. United States, 6 Cir., 1956, 228 F.2d 944, 945; Martin v. United States, 6 Cir., 1946, 154 F.2d 269; Gordon v. United States, 6 Cir., 1949, 178 F.2d 896. Among other criteria ordinarily required for the granting of a new trial for newly discovered evidence, are that the new evidence must not be merely cumulative and that it be such that on a new trial such evidence would probably produce an acquittal. United States v. West, D.C., 170 F.Supp. 200, 208; Pitts v. United States, 9 Cir., 1959, 263 F.2d 808; United States v. Rutkin, 3 Cir., 1953, 208 F.2d 647.

The testimony of Barker would corroborate that of the defendant in most respects and as to the claim that Ashe Hosiery Mills actually purchased yarn from Yarns Associated and that defendant Ashe loaned money to Barker, his testimony would corroborate and be cumulative of other witnesses called by defendant. Defendant, however, argues that the district judge should have recognized an exception to the rule relating to the insufficiency of cumulative evidence in this regard. He relies on some au-

thorities which have suggested that where a defendant was himself uncorroborated, or where those who had corroborated him were either interested witnesses or had been discredited, a court should grant a new trial to allow newly discovered evidence to be given by a disinterested witness or by one whose evidence would have more probative or convincing power than those who had testified. Sluman v. Dolan, 24 S.D. 32, 123 N.W. 72; State v. McKean, 46 S.D. 85, 190 N.W. 781; Taulbee v. State, 133 Tex.Cr.R. 530, 113 S.W.2d 182; State v. Wiley, 106 S.C. 437, 91 S.E. 382; Abramson v. State, 120 Tex.Cr.R. 11, 47 S.W.2d 303; Johnson v. Commonwealth, 188 Ky. 391, 222 S.W. 106; Fletcher v. People, 117 Ill. 184, 7 N.E. 80; Beland v. State, 86 Tex.Cr.R. 285, 217 S.W. 147; State v. Evans, 98 Or. 214, 192 P. 1062, 193 P. 927; Wisniewski v. Wysocki, Sup., 36 N.Y.S.2d 712; Johnson v. Commonwealth, 126 Va. 770, 101 S.E. 341; Meinberg v. Jordan, 29 Cal.App. 760, 157 P. 1005, 1007; Herrald v. Paris, 89 Kan. 131, 130 P. 684.

■ Whatever may be said for the reasoning of these authorities, we will not find an abuse of discretion by the district judge here for refusing to consider that the testimony of Barker, a collaborator with the defendant in the acts which were found to be criminal and who fled the country under indictment for his own participation in the same and like activities, would be of such disinterested and forcefully corroborative quality as to call for exceptional consideration.

We, likewise, are not persuaded that the district judge was guilty of judicial indiscretion in entertaining the opinion that Barker's testimony would not probably have produced an acquittal. The denial of defendant's motion for new trial will not be disturbed by us.

The judgments of conviction are affirmed.